Plaintiff William Jurkowitz, by his undersigned attorneys, alleges the following upon knowledge as to his own acts and upon information and belief as to all other matters based upon the investigation made by and through his attorneys, which investigation included, *inter alia,* a review of Securities and Exchange Commission ("SEC") filings, press releases, analyst reports, news articles and/or other materials.

## **NATURE OF THE ACTION**

1. This is a stockholder class action brought by plaintiff on behalf of himself and all purchasers of Pacific Capital Bancorp ("PCBC" or the "Company") common stock during the period April 30, 2009, when the Company issued its first quarter 2009 financial results and announced that it was maintaining a strong allowance for loan losses which would enable the Company to absorb losses in the portfolio as the recession continues, through July 30, 2009, when the Company reported an additional loan loss provision of $117 million, a goodwill charge of

3.     As the truth about the Company's exposure became known to the market, the price of the Company's common stock declined from a closing price of $6.94 on April 30, 2009, to a closing price of $2.12 on July 31, 2009, the day after the truth about the Company's risk was confirmed.  As a consequence of the artificially inflated price of PCBC common stock during the Class Period, investors who purchased shares at artificially inflated prices suffered damages.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28U.S.C. §§ 1331 and 1337, and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

5.     This action arises under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated under § 10(b) by the SEC, 17 C.F.R. § 240.10b-5.

1        9.     Defendant PCBC is a bank holding company organized and existing

2   under the laws of the State of California, with its principal executive offices located at

3   1021 Anacapa Street, Santa Barbara, California. PCBC is and at all times relevant

4   hereto was listed and traded on the NASDAQ securities exchange under the symbol

5   "PCBC". PCBC is the parent company of Pacific Capital Bank, N.A., a nationally

6   chartered bank that operates 46 branches under the local brand names of Santa

7   Barbara Bank & Trust, First National Bank of Central California, South Valley

8   National Bank, San Benito Bank and First Bank of San Luis Obispo.

9        10.    Defendant George Leis ("Leis") has been at all times relevant hereto the

10  President, Chief Executive Officer and Chief Information Officer of PCBC.

11       11.    Defendant David Porter ("Porter") has been at all times relevant hereto

12  the Chief Credit Officer of PCBC.

13       12.    The defendants named above in ¶¶ 10 - 11 are sometimes collectively

14  referred to herein as the "Individual Defendants."

15       13.    The Individual Defendants and defendant PCBC are sometimes

16  collectively referred to herein as the "PCBC Defendants."

17       14.    Defendant Sandler O'Neill & Partners L.P. ("Sandler O'Neill") has, at

18  all times relevant hereto provided analyst coverage and issued analyst reports and

19  ratings relating to PCBC. Sandler O'Neill is a privately-held firm, which describes

common stock during the Class Period who suffered damages as a result of those transactions (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the defendants.

17. This action is properly maintainable as a class action.

18. The members of the Class are so numerous that joinder of all members is impracticable. According to PCBC's SEC filings, as of April 30, 2009, there were 46,682,465 shares of PCBC common stock outstanding. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes there are hundreds if not thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by PCBC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

19. Plaintiff's claims are typical of the other members of the proposed Class, as all Class members are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

20. The disposition of Class members' claims in a class action will be of benefit to the parties and the Court.

21. There is a well-defined community of interest in the questions of law and fact involved affecting the members of the Class. Among the questions of law and fact which are common among the members of the Class, which predominate over questions affecting any individual Class member, are *inter alia,* the following:

(a) whether certain documents filed by the Company with the SEC contain materially false and misleading statements, in violation of Section 10(b) of the Exchange Act;

5

1    (b)    whether statements made by defendants to the investing

2    public during the Class Period misrepresented material facts about the

3    business, operations, finances and/or outlook of PCBC; and

quarter of $7.9 million, or ($0.17) per share.  According to the April 30, 2009 press release, "[t]he pretax loss generated by the Core Bank in the first quarter of 2009 was primarily a continuation of the trends experienced throughout 2008, including elevated charge-offs in the residential construction loan portfolio and a compression in net interest margin."

26.   The Company's April 30, 2009 press release also reported that "[f]inancial results for the first quarter 2009 include a provision for loan losses in the Core Bank of $73.5 million. . . [which] increases the Company's allowance for loan losses in the Core Bank to $141.0 million, or 2.48% of total loans, at March 31, 2009."

27.   The Company's April 30, 2009 press release included comments by defendant Leis, stating, *"We continue to maintain a strong allowance for loan losses, which we believe will enable us to absorb losses in the portfolio as the recession continues."*  (Emphasis added.)

28.   The Company's April 30, 2009 press release also addressed the Company's "Asset Quality", reporting several steps taken to address loan risk and exposure as follows:

While the balance of this portfolio has dropped to $198 million at

March 31, 2009, from $274 million at March 31, 2008, the Company has

|   |   |
|---|---|
| 1 | •     disallowing any construction lending outside of the Company's |
| 2 | footprint; and |
| 3 | •     establishing a Board of Directors-level loan committee to oversee |
| 4 | concentrations and problem loan resolution, among other |
| 5 | responsibilities. |

29.    Also on April 30, 2009, the Company conducted a conference call with analysts during which the Company reiterated many of the statements contained in the Company's April 30, 2009 Form 8-K and press release. For example, during the April 30, 2009 analyst conference call defendant Leis stated that *"[t]he deterioration occurred in loans that were already in the non-performing category entering the quarter. [And that], [w]e did not see any meaningful new inflows of residential construction loans into non-performing this quarter."* (Emphasis added.)

30.    Defendant Leis further stated during the April 30, 2009 conference call with analysts that "[t]he provision we recorded this quarter has kept our core bank allowance for loan losses at *a very high level.* At March 31, 2009 our allowance represented 2.48% of total loan [sic] [and] approximately 90% of our allowance is allocated to loans that are not currently impaired which we believe *positions us well to observe [sic] the inherent losses in the portfolio.*" (Emphasis added.)

31.    The Company's April 30, 2009 conference call with analysts also included comments, among others, by defendant Porter, in response to the following question from defendant Leis:

> *George Leis:* Dave, that portfolio that residential home builder portfolio
> has been reviewed, examined and pretty much entirely classified. Right?
>
> *Dave Porter:* I mean – obviously with what's happened there with the
> industry, *we have looked at that very closely with the regulators,* with
> our home loan review and the marks we have taken now are very current
> marks and hopefully going forward we won't see the same deterioration

8

1  particularly after you have had a significant write down on some of these

2  assets.

3  (Emphasis added.)

4      32.    The Company's April 30, 2009 conference call with analysts also

5  included comments, among others, by defendant Porter, in response to the following

6  question from the Company's Chief Financial Officer, Steven Masterson:

7      *Steven Masterson:* And, Dave, do we have a handful of large loans and

8      granularity – *that concentration doesn't exist in the remaining part of the*

9      *portfolio,* it's a little more granular whether its not be [sic] –

10

11     *Dave Porter: Yes, exactly.* I think we saw three or four large accounts in

12     the fourth quarter, similarly in the first quarter, three or four large

13     accounts that made up the majority of the mark downs. And we just are

14     not seeing that opportunity to do that in this portfolio going forward yet.



| 1 | big spike in the early delinquencies in that third quarter in construction |
|---|---|
| 2 | which you are clearly working through and marking down as you need, |
| 3 | can you talk about your ability to sell your non-performing loan or |
| 4 | resolve your non-performing loans because that level is growing? Bust |
| 5 | also *because your early stage delinquency number looks like it's sitting* |
| 6 | *fairly steady.* So like what are the new construction loans are starting to |
| 7 | trickle in there. In mean the rate of change is slow but there is still some |
| 8 | growth right? |
| 9 | |
| 10 | *George Leis:* Yes. Actually it looks like our delinquency and then |
| 11 | looking at construction *it's actually come down a little bit from fourth* |
| 12 | *quarter.* And then on our non-performing loans on construction that's |
| 13 | also come down if you look at the table on page 15. |
| 14 | |
| 15 | *Analyst:* Yes, I looked at that and so it looks like the 30 to 89's migrated |
| 16 | into NPL's, right? But then there is still like a base line level of 30 to |
| 17 | 89's still sitting there. I was wondering are those new loans? *Are they* |
| 18 | *like ones from before? Like what new weaknesses are you seeing in* |
| 19 | *construction if any?* Like some other banks have condos start popping |
| 20 | up and things like that? |
| 21 | |
| 22 | *George Leis:* I can't say it's been new. This portfolio has been a |
| 23 | problem I think starting in the first quarter of 2008 for us. So, I am *not* |
| 24 | *sure we are seeing a lot of new activity come into that portfolio this* |
| 25 | *quarter,* Juliana. |
| 26 | |
| 27 | *Analyst:* Right. |
| 28 | |

1      *George Leis:* You question around the commercial real estate

2      delinquency, *we are watching that very closely obviously, but we have*

3      *not seen the delinquency metrics really be too negative at this point. I*

4      *thing it's been relatively manageable.*

5 (Emphasis added.)

6      34.     The Company's April 30, 2009 conference call with analysts also

1 announcing its deferral of interest on the junior subordinated notes and suspension of
2 cash dividends on its outstanding common stock and preferred stock.

3      38.    The Company's stock price declined upon the Company's June 22, 2009
4 announcement, falling from a closing price of $3.31 per share on June 22, 2009, to a
5 closing price of $2.65 per share on June 23, 2009. The Company's stock price
6 continued to decline through the remainder of that week, to close at $2.26 per share
7 on Friday June 26, 2009.

8      39.    A news article published on June 27, 2009 by *The Associated Press,*
9 authored by that agency's national business columnist Rachel Beck and headlined
10 *"Investors' tools to understand banks"*, reported as follows:

11        The timing of the announcement [of suspension of dividend
12 payments] was tied to the fact that the interest payments on certain types
13 of its preferred securities were due and the bank needed to notify the
14 people who held them that it was deferring the payments and couldn't
15 pay any dividends, according to Pacific Capital spokeswoman Debbie
16 Whiteley.

17

18        That will save the bank about $8 million per quarter . . . but

analyses that analysts typically -- and admittedly -- perform in assessing the financial condition of a bank, they would have understood that Pacific Capital was not, at that time, a good investment. While it would not have been expected that the "reasonable investor" would have had the know-how or sophistication to perform the kind of analyses that Deer admitted he should have performed, there was no excuse for Deer's reckless failure to perform such analyses and to not issue a "Buy" recommendation unless the results of the analyses supported such a recommendation and continuation of the payment of dividends. Deer acknowledged in an interview that his upgrade was the wrong call. But in doing, so, he also reminded himself of the regulatory rule he should have been watching: Bank dividends are imperiled if the payouts are more than the banks have cumulatively earned over the last two years.

> Deer estimates Pacific Coast lost about $19 million between the third quarter of 2007 and the second quarter of this year. He forecasts Pacific Capital's losses for all of this year will total $25.75 million in 2009, on top of a loss of $23.84 million in 2008.

> "Honestly, I had not reviewed the earnings progression and considered how that would affect their ability to pay dividends," Deer said.

43.     The Company's July 30, 2009 Form 8-K and press release announced that PCBC experienced a second quarter 2009 net loss of $362.6 million, or ($7.77) per share, compared to a net loss of $5.9 million, or ($0.13) per common share, in the second quarter of 2008.

44.     Included in the Company's second quarter 2009 financial results was a disclosure that the Company recorded a provision for loan losses of $194.1 million for the second quarter 2009, which, according to the disclosure, "increase[d] the Company's allowance for loan losses in the Core Bank by $117 million", and that "[a]t June 30, 2009, the allowance was $258.0 million, or 4.57% of total loans and 80% of non-performing loans." The Company also disclosed a "$128.7 million non-cash charge to reflect an impairment of goodwill."

45.     According to the July 30, 2009 Form 8-K and press release, the $194.1 million second quarter 2009 provision for loan losses included the following components:

1.     $77.1 million to cover net charge-offs in the Core Bank, of which approximately $30.1 million related to the residential construction portfolio and $27.0 million related to the commercial and industrial portfolio; and

2.     $117.0 million added to the allowance for loan losses in the Core Bank to reflect in increase in problem loans and higher loss rates in recent quarters.

46.     The Company's July 30, 2009 Form 8-K and press release provided the following additional disclosures concerning the $194.1 million loan loss provision:

The increase to the allowance for loan losses was directionally consistent with the recent elevated credit losses experienced by the Company. Further, in recognition of these recent credit losses and the continued deterioration of the general economic environment, the

1    Company shortened the timeframe utilized for estimating historical loss

2    rates in its calculations of the FAS 5 component of the allowance (i.e.,

3    reserve for non-impaired loans calculated on a loan pool basis).  The

4    shortened timeframe placed more weight on the recent history of

| (Dollars in Millions) | March 30, 2009 | June 30, 2009 |
|---|---|---|
| Total non-performing assets | $271.1 | $348.3 |
| Total non-performing assets / total assets | 3.41% | 5.00% |
| | | |
| Allowance to non-performing loans | 54% | 80% |

48.    The Company's July 30, 2009 Form 8-K and press release also contained comments by defendant Leis, as follows:

> "[G]iven the ongoing weakness in the California economy and housing market, we have substantially strengthened our allowance for loan losses.  As a result of this build in reserves, our allowance for loan losses increased to 4.57% of total loans and 80% of total non-performing loans in the Core Bank at June 30, 2009.  While the increase in allowance for loan losses had a negative impact on our second quarter results, we believe the higher level of allowance will benefit the Company going forward as we continue to manage through the credit cycle."

49.    The Company's July 30, 2009 Form 8-K and press release also disclosed that the Company retained Sandler O'Neill & Partners, L.P., one of the Analyst Defendants herein, which had only weeks before issued a "Buy" recommendation, to serve as a financial advisor to the Company in connection with a process initiated by the Company's Board of Directors to identify and evaluate a broad range of strategic alternatives to further strengthen the Company's capital based and enhance shareholder value.

50.    A news article relating to the Company's second quarter results was

1    Pacific Capital Bancorp (PCBC) says it lost $4.46 per share in Q2,
2    less items.  The Thomson Reuters estimates for a $0.33 per share loss.
3    Its allowance for loan losses increased to 4.57% of total loans and 80%
4    of total non-performing loans in the Core Bank at June 30.  It says its
5    Tier 1 leverage ratio was not sufficient to meet the higher level that the
6    Bank has agreed with the Office of the Comptroller of the Currency to
7    maintain.  The Board has initiated a process to identify and evaluate a
8    broad range of strategic alternatives to further strengthen the Bank's
9    capital base and enhance shareholder value.  As part of this process, the
10   Board has retained Sandler O'Neill & Partners, L.P. to serve as a
11   financial advisor.

12   51.    During the Company's July 30, 2009 second quarter earnings conference
13   call with analysts, defendant Leis indicated that the Company was faced with the
14   same issues that it had been facing for some time and made the following statements,
15   among others:

16   The drivers of our elevated credit costs continue to be the same
17   issues that we have discussed in previous quarters.  Approximately 39%
18   of the net charge-offs in the second quarter occurred within our
19   residential construction portfolio of [sic] the value of the collateral
20   underlying these loans continue to decline.

22   Another 35% of the net charge-offs came from CNI loans,
23   including some businesses that are related to the residential construction
24   industry.  A large provision we recorded this quarter is partially
25   attributable to a change in the methodology that we use to calculate our
26   general reserve for the FAB [sic] five component of the allowance for
27   loan losses.

In recognition of the dramatic change in the economic conditions
that has taken place over the past 2 years, we significantly shortened the
time frame that is utilized for estimating historical loss rates from the 7
year period that we have typically used. The shortened time frame had
the effect of giving more weight to recent quarters in which loss rates
have been higher.

As a result we added approximately $88 million more to the
general reserve this quarter then [sic] we would have under the more
elongated time frame. This is a more conservative methodology that we
believe is appropriate in the current economic environment.

52.     During the July 30, 2009 conference call, the Company's Chief Financial



maintaining a strong allowance for loan losses which would enable the Company to absorb losses in the portfolio as the recession continues. Contrary to the Company's statements on April 30, including the assurance that the Company's allowance for loan losses was at a very high level, the July 30 announcement revealed to investors that the Company had not adequately reserved for loan losses and, in fact, had not even applied a conservative methodology by which to do so.

55. The following day, on July 31, 2009, the Analyst Defendants reversed their June 17, 2009 upgrade of PCBC common stock, and downgraded PCBC common stock from "Buy" to "Hold."

56. A news article relating to the Company's second quarter results published by *American Banker* on July 31, 2009, by Marissa Fajt, headlined *"Calif. Bank Weighs Options After It Loses $360M in 2Q"*, stated that "[t]he $7.3 billion-asset company said its net loss ballooned to $360 million in the second quarter, from $5.9 million a year earlier. The second-quarter loss was largely due to a $194 million loan-loss provision and a $129 million goodwill charge."

57. The statements contained above in ¶¶ 26-35, were each materially false or misleading when issued because those assurances to investors that the Company was adequately reserved were belied by the Company's admission on July 30, 2009

measures announced by the Company on April 30, 2009 were not sufficient to *"mitigate the risk going forward"*.

60. The PCBC Defendants' statements contained in ¶ 29 above were materially false and misleading because, as would be disclosed on July 30, 2009, the Company did in fact have *"meaningful new inflows of residential construction loans [moving] into non-performing"* in the second quarter. This, in combination with the additional statement on April 30, 2009 set forth in ¶ 29, that *"[t]he deterioration occurred in loans that were already in the non-performing category entering the quarter"* told investors that new inflows were unlikely in the second quarter.

61. The PCBC Defendants' statements contained in ¶ 30 above were materially false and misleading because, as would be disclosed on July 30, 2009, the first quarter loan loss provision was not, in fact, *"at a very high level"* and would not *"position[] [the Company] well to [absorb] [sic: observe] the inherent losses in the portfolio."* In fact, the PCBC Defendants admitted that the first quarter provision was not at a very high level because it was not until the end of the second quarter that PCBC changed to a method that the PCBC Defendants called conservative.

62. The Company admitted on July 30, 2009 that prior to that point, contrary to the impression given to investors, the Company had not applied a conservative reserve methodology.

63. The PCBC Defendants' statements contained in ¶ 31 above were materially false and misleading because, as would be disclosed on July 30, 2009, the first quarter loss provision was not sufficient to render second quarter portfolio exposures *"entirely classified."*

64. The Analyst Defendants' statements, referred to in ¶ 36 as the June 17, 2009 rating upgrade, were materially false and misleading because, as was reported on June 27, 2009, the analyst had as of June 27, 2009 already acknowledged that his upgrade was "wrong" and, "in doing so, he also reminded himself of the regulatory

65. The Analyst Defendants' failure to reverse the upgrade for more than a month after it was acknowledged to be "wrong" was also materially false and misleading because it knowingly carried forward an ongoing falsehood.

66. The PCBC Defendants acted with scienter in that the PCBC defendants knew or recklessly disregarded the fact that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading. Defendants knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public and they substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding PCBC, their control over, and/or receipt and/or modification of defendants' materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning PCBC, participated in the fraudulent scheme alleged herein.

67. The sheer magnitude of the second quarter loan loss provision also demonstrates *scienter* on the part of the PCBC Defendants. Compared to the additional first quarter provision of $73.5 million (for a total provision of $141 million), the additional second quarter loan loss provision of $117 million (for a total provision of $258 million at June 30, 2009), represented more than double the Company's net interest income for the second quarter of 2009 of $53.4 million.

68. *Scienter* on the part of the Analyst Defendants in issuing a June 17, 2009 rating upgrade is demonstrated by the fact that the analyst admitted that there were certain simple calculations and regulatory rules that could have been utilized to foresee the Company's difficulties, thus demonstrating that they were acting with reckless disregard for the truth.

1      69.   *Scienter* on the part of the Analyst Defendants in failing to correct the

2    June 17, 2009 rating upgrade is demonstrated by an *Associated Press* news article of

3    June 27, 2009, which reported that the analyst admitted during an interview that the

4    upgrade was "wrong", yet the Analyst Defendants did not reverse the upgrade for

5    more than 4 weeks thereafter.  The implication from the meeting reported to have

6    taken place a week before the rating upgrade added to its authoritative profile.



1     72.    As a result of the foregoing, the market for PCBC's stock promptly

2 digested current information regarding PCBC from all publicly available sources and

3 reflected such information in PCBC's stock price. Under these circumstances, all

4 purchasers of PCBC's common stock during the Class Period suffered similar injury

5 through their purchase of PCBC's common stock at artificially inflated prices and a

6 presumption of reliance applies.

7 **NO SAFE HARBOR**

8     73.    The statutory safe harbor provided for forward-looking statements under

9 certain circumstances does not apply to any of the allegedly false statements pleaded

10 in this complaint. Many of the specific statements pleaded herein were not identified

11 as "forward-looking statements" when made. Moreover, the specific statements

12 pleaded herein related to then-existing conditions. To the extent there were any

13 forward-looking statements, there were no meaningful cautionary statements

1   throughout the Class Period, did: (a) deceive the investing public, including plaintiff

2   and other Class members, as alleged herein; (b) artificially inflate and maintain the

3   market price of PCBC's common stock; and (c); cause plaintiffs and other members

4   of the Class to purchase PCBC's common stock at artificially inflated prices.  In

5   furtherance of this unlawful scheme, plan and course of conduct, defendants, and

6   each of them, took the actions set forth herein.

7       76.    Defendants (a) employed devices, schemes, and artifices to defraud;

8   (b) made untrue statements of material fact and/or omitted to state material facts

9   necessary to make the statements not misleading; and (c) engaged in acts, practices,

10  and a course of business which operated as a fraud and deceit upon the purchasers of

11  the Company's securities in an effort to maintain artificially high market prices for

12  PCBC's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

13  All defendants are sued either as primary participants in the wrongful and illegal

14  conduct charged herein or as controlling persons as alleged below.

15      77.    In addition to the duties of full disclosure imposed on defendants as a

16  result of their affirmative statements and reports, or participation in the making of

17  affirmative statements and reports to the investing public, the PCBC Defendants had

18  a duty to promptly disseminate truthful information that would be material to

19  investors in compliance with the integrated disclosure provisions of the SEC as

20  embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation

1  conceal adverse material information about the business, operations and future
2  prospects of PCBC as specified herein.

3      79.    Each of the Individual Defendants' primary liability, and controlling
4  person liability, arises from the following facts: (a) each of these defendants were
5  high-level executives and/or directors at the Company during the Class Period and
6  members of the Company's management team or had control thereof; (b) each of
7  these defendants, by virtue of his or her responsibilities and activities as a senior
8  officer and/or director of the Company was privy to and participated in the creation,
9  development and reporting of the Company's internal budgets, plans, projections
10 and/or reports; (c) each of these defendants enjoyed significant personal contact and
11 familiarity with the other defendants and was advised of and had access to other
12 members of the Company's management team, internal reports and other data and
13 information about the Company's finances, operations, and sales at all relevant times;
14 and (d) each of these defendants was aware of the Company's dissemination of
15 information to the investing public, which they knew or recklessly disregarded was
16 materially false and misleading.

17     80.    The Individual Defendants had actual knowledge of the
18 misrepresentations and omissions of material facts set forth herein, or acted with
19 reckless disregard for the truth in that they failed to ascertain and to disclose such
20 facts, even though such facts were available to them.  Such defendants' material
21 misrepresentations and/or omissions were done knowingly or recklessly and for the
22 purpose and effect of concealing PCBC's operating condition and future business
23 prospects from the investing public and supporting the artificially inflated price of its
24 securities.  As demonstrated by defendants' overstatements and misstatements of the
25 Company's business, operations and earnings throughout the Class Period,
26 defendants, if they did not have actual knowledge of the misrepresentations and
27 omissions alleged, were reckless in failing to obtain such knowledge by deliberately

1  refraining from taking those steps necessary to discover whether those statements
2  were false or misleading.

3        81.   As a result of the dissemination of the materially false and misleading
4  information and failure to disclose material facts, as set forth above, the market price
5  of PCBC's common stock was artificially inflated during the Class Period.  In
6  ignorance of the fact that market prices of PCBC's publicly-traded securities were
7  artificially inflated, and relying directly or indirectly on the false and misleading
8  statements made by defendants, or upon the integrity of the market in which the
9  securities trade, and/or on the absence of material adverse information that was
10  known to or recklessly disregarded by defendants but not disclosed in public
11  statements by defendants during the Class Period, plaintiff and the other members of
12  the Class purchased PCBC common stock during the Class Period at artificially high
13  prices and were damaged thereby by virtue of the plaintiff and the other class
14  members having bought PCBC stock at inflated prices and continuing to hold that
15  stock as the market began to learn the truth and the inflation began to dissipate from
16  the PCBC stock price.

17        82.   At the time of said misrepresentations and omissions, plaintiff and other
18  members of the Class were ignorant of their falsity, and believed them to be true.
19  Had plaintiff and the other members of the Class and the marketplace known of the
20  true financial condition and business prospects of PCBC, which were not disclosed
21  by defendants, plaintiff and other members of the Class would not have purchased or
22  otherwise acquired their PCBC common stock, or, if they had acquired such common
23  stock during the Class Period, they would not have done so at the artificially inflated
24  prices which they paid.

25        83.   As a direct and proximate result of defendants' wrongful conduct,
26  plaintiff and theother members of the Class suffered damages in connection with their
27  respective purchases and sales of the Company's common stock during the Class
28  Period.

84. By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## SECOND CLAIM

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5

### Against the Analyst Defendants

85. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

86. During the Class Period, the Analyst Defendants, and each of them,

S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

89. The Analyst Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of PCBC as specified herein.

90. Each of the Analyst Defendants' primary liability arises from the following facts: (a) each of these defendants were major analysts who issued reports and ratings relating to the Company during the Class Period; (b) each of these defendants, by virtue of his or her responsibilities and activities as an analyst was privy to and participated in the creation, development and reporting of analyst reports about the Company; (c) each of these defendants had access to members of the Company's management team, reports and other data and information about the

not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

92.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of PCBC's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of PCBC's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired PCBC common stock during the Class Period at artificially high prices and were, by virtue of having purchased PCBC stock at inflated prices and continuing to hold that stock as the market began to learn the truth and the inflation began to dissipate from the PCBC stock price, damaged thereby.

93.    At the time of said material misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known of

1    95.    By virtue of the foregoing, the Analyst Defendants have violated Section

2  10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

3                                **THIRD CLAIM**

4                    **Violation of Section 20(a) of the Exchange Act**

5                        **Against the Individual Defendants**

6    96.    Plaintiff repeats and realleges each and every allegation contained above

7  as if fully set forth herein.

8    97.    The Individual Defendants acted as controlling persons of PCBC within

9  the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of

10  their high-level positions, and their ownership and contractual rights, participation in

11  and/or awareness of the Company's operations and/or intimate knowledge of the

12  Company's operations and the significant and material problems that the Company

13  was experiencing as a direct result of its restructuring, the Individual Defendants had

14  the power to influence and control and did influence and control, directly or

15  indirectly, the decision-making of the Company, including the content and

16  dissemination of the various statements that plaintiffs contend are false and

17  misleading.  The Individual Defendants were provided with or had unlimited access

18  to copies of the Company's reports, press releases, public filings and other statements

19  alleged by plaintiffs to be misleading prior to and/or shortly after these statements

20  were issued and had the ability to prevent the issuance of the statements or cause the

21  statements to be corrected.

22    98.    In particular, each of these defendants had direct and supervisory

Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class, by virtue of having purchased PCBC stock at inflated prices and continuing to hold that stock as the market began to learn the truth and the inflation began to dissipate from the PCBC stock price, suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing conduct, in an amount to be proven at trial, including interest thereon;

(c)     Awarding plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  September 8, 2009                STULL, STULL & BRODY

By:  _Patrice Lee_
Patrice L. Bishop
10940 Wilshire Boulevard
Suite 2300
Los Angeles, CA  90024
Tel:   (310) 209-2468
Fax:  (310) 209-2087

//

31

Jules Brody
jbrody@ssbla.com
Mark Levine
mlevine@ssbny.com
Jason D'Agnenica
jasondag@ssbny.com
STULL, STULL & BRODY
6 East 45th Street
New York, NY 10017
Tel:   (212) 687-7230
Fax:   (212) 490-2022

**Counsel for Plaintiffs**

## PLAINTIFF CERTIFICATION

William + Sarah Jurkowitz ("Plaintiff") hereby states that:

1.  Plaintiff has reviewed the complaint and has authorized the filing of the complaint on his/her behalf.

2.  Plaintiff did not purchase any securities of Pacific Capital Bancorp ("Pacific Capital" or the "Company") at the direction of his/her counsel or in order to participate in this private action.



# Appendix A

## Pacific Capital Bancorp Common Stock

| TRADE DATE | SECURITY | QUANTITY | PRICE PER SHARE | PURCHASE / SALE |
|---|---|---|---|---|
|  |  |  |  |  |
| 6/17/2009 | PCBC | 2,000 | $4.13 | Purchase |
| 6/17/2009 | PCBC | 2,000 | $4.11 | Purchase |
| 6/17/2009 | PCBC | 2,000 | $3.77 | Purchase |
| 6/22/2009 | PCBC | 6,000 | $3.54 | Sale |
|  |  |  |  |  |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge R. Gary Klausner and the assigned discovery Magistrate Judge is Paul L. Abrams.

The case number on all documents filed with the Court should read as follows:

### CV09- 6501 RGK (PLAx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=============================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Patrice L. Bishop (SBN 182256)
STULL, STULL & BRODY
10940 Wilshire Boulevard, Suite 2300
Los Angeles, CA 90024
Tel: (310) 209-2468
Fax: (310) 209-2087

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM JURKOWITZ, Individually and on Behalf of all Others Similarly Situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>PACIFIC CAPITAL BANCORP, GEORGE LEIS, DAVID PORTER, SANDLER O'NEILL & PARTNERS L.P., and SANDLER O'NEILL ASSET MANAGEMENT LLC,<br>DEFENDANT(S). | CASE NUMBER<br><br>**CV 09-06501 RGK PLAx**<br><br><br><br>**SUMMONS** |

TO:    DEFENDANT(S):    PACIFIC CAPITAL BANCORP, GEORGE LEIS, DAVID PORTER, SANDLER O'NEILL & PARTNERS L.P., and SANDLER O'NEILL ASSET MANAGEMENT LLC

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _Patrice L. Bishop, Esq._____, whose address is _STULL, STULL & BRODY, 10940 Wilshire Blvd., Suite 2300, Los Angeles, CA 90024_. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Dated: _____SEP - 8 2009_____

Clerk, U.S. District Court

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)

**DEFENDANTS**

PACIFIC CAPITAL BANCORP, GEORGE LEIS, DAVID PORTER, SANDLER O'NEILL & PARTNERS L.P., and SANDLER O'NEILL

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)    ☐ A. Arise from the same or closely related transactions, happenings, or events; or

                        ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

                        ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

                        ☐ D. Involve the same patent, trademark or copyright, <u>and</u> one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Plaintiff William Jurkowitz resides in the state of New Jersey |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Pacific Capital Bancorp, George Leis, and David Porter - County of Santa Barbara | Sandler O'Neill Asset Management LLC - state of New York<br>Sandler O'Neill & Partners L.P. - state of New York |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
     **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| All claims arose in the county of Santa Barbara. | |