KARL D. BELGUM (State Bar No. 122752)
kbelgum@nixonpeabody.com
STEPHANIE A. KARNAVAS (State Bar No. 255596)
skarnavas@nixonpeabody.com
NIXON PEABODY LLP
One Embarcadero Center, 18th Floor
San Francisco, California 94111-3600
Telephone: (415) 984-8200
Fax:  (415) 984-8300

Attorneys for Defendant
Sandler O'Neill & Partners L.P.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **In re PACIFIC CAPITAL BANCORP SECURITIES LITIGATION**<br><br>**This Document Relates Only To:**<br><br>**Shotke v. Pacific Coast Bancorp, et al., Case No. CV09-7400** | CV09-06501 RGK (PLAx)<br><br><u>CLASS ACTION</u><br><br>**NOTICE OF MOTION AND MOTION TO DISMISS BY SANDLER O'NEILL & PARTNERS L.P.; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing:    February 1, 2010<br>Time:    9:00 a.m.<br>Judge:    Hon. R. Gary Klausner<br>Room:    Courtroom 850 |

TO ALL PARTIES HEREIN AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 25, 2010, defendant Sandler O'Neill & Partners L.P. ("Sandler O'Neill") will and does hereby move for dismissal of the Class Action Complaint ("Complaint"), dated October 13, 2009. This Motion is made pursuant to Federal Rules of Civil Procedure, 9(b), 12(b)(6) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 (the "PSLRA").

This Motion is made on the grounds that the allegations of the Complaint fail to plead fraud with particularity or otherwise state a claim for relief under Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the PSLRA for violation of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5); they do not adequately plead a false statement of material fact; they do not adequately plead fraudulent conduct or scienter; and they do not adequately plead loss causation.

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Aaron James Deer, the Complaint, other documents incorporated by reference by the Complaint, the complete files and records in this action, and oral argument as the Court may consider in deciding this Motion.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on December 14, 2009.

DATED:  December 18, 2009                 Respectfully submitted,

NIXON PEABODY LLP


By:  ___/s/ Karl D. Belgum_____
               Attorneys for Defendant
SANDLER O'NEILL & PARTNERS L.P.

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................. 1

II.  STATEMENT OF RELEVANT FACTUAL ALLEGATIONS ........... 3

    A.   The Parties ................................................................................... 3

    B.   Sandler O'Neill's Buy Recommendation ................................... 3

    C.   PCBC's June 22, 2009 Announcement ...................................... 4

    D.   The James Deer Interview .......................................................... 4

    E.   PCBC's 2Q 2009 Results ........................................................... 5

III. ARGUMENT ....................................................................................... 6

    A.   Plaintiff Must Satisfy Exacting Pleading Standards to Avoid
        Dismissal ..................................................................................... 6

    B.   Plaintiff Fails to Plead a Material False or Misleading
        Statement of Fact ........................................................................ 7

        1.   The Complaint Fails to Identify a False Statement of
              Material Fact and Provide Reasons Why it is False or
              Misleading ......................................................................... 7

        2.   Plaintiff Has Not Adequately Pled that the Failure to
              Downgrade the Stock Was An Actionable False
              Statement ......................................................................... 11

    C.   Plaintiff Fails to Plead Facts Supporting a Strong Inference of
        Scienter ..................................................................................... 13

        1.   Failure to Consider "Simple Calculations and Regulatory
              Rules" ............................................................................... 14

        2.   Failure to Downgrade After "Admitting" the Buy was
              "Wrong" ........................................................................... 16

        3.   The Disclosed Investment Banking Relationship Does
              Not Support a Strong Inference of Scienter ..................... 17

    D.   Plaintiff Fails To Plead Loss Causation ................................... 18

        1.   Plaintiff Fails to Plead that the Buy Inflated the Price of
              PCBC Shares ................................................................... 18

        2.   Plaintiff Fails to Plead that the Disclosure of the
              Purported Falsity of the Buy Opinion Caused Any
              Economic Loss ................................................................. 19

IV.  CONCLUSION ................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Branch v. Tunnell*,
  14 F.3d 449 (9th Cir. 1994), overruled on other grounds, 307 F.3d 1119 (9th
  Cir. 2002) .............................................................................................................. 3

*DeMarco v. Lehman Bros. Inc*.,
  309 F. Supp. 2d 631 (S.D.N.Y. 2004) ................................................................. 7

*Dsam Global Value Fund v. Altris Software, Inc*.,
  288 F.3d 385 (9th Cir. 2002) ................................................................... 15, 16, 17

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005) ....................... 6, 18, 19

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185, 96 S. Ct. 1375 ............................................................................. 13

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ......................................................................... 8, 11

*In re Apple Computer Sec. Litig*.,
  886 F.2d 1109 (9th Cir. 1989) ........................................................................... 19

*In re Caere Corporate Securities Litigation*,
  857 F. Supp. 1054 ( N.D. Cal. 1993) ................................................................. 10

*In re Credit Suisse First Boston (Agilent Tech., Inc.) Analyst Reports Sec. Litig.*,
  No. 02-12056, 2005 U.S. Dist. LEXIS 6345 (D. Mass. Mar. 31, 2005) ........ 9, 12

*In re Credit Suisse First Boston (Agilent Techs., Inc.) Analyst Reports Sec.
  Litig.*,
  431 F.3d 36 (1st Cir. 2005) ................................................................. 7, 8, 9, 17

*In re Daou Sys. Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ..................................................................... 18, 19

*In re Gilead Sciences Securities Litigation*,
  536 F.3d 1049 (9th Cir. 2008) ........................................................................... 18

*In re GlenFed, Inc. Sec. Litig.*,
   42 F.3d 1541 (9th Cir. 1994) (*en banc*)..........................................................6, 10

*In re McKesson HBOC Secs. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000).................................................................9

*In re Salomon Analyst AT&T Litig.*,
   350 F. Supp. 2d 455 (S.D.N.Y. 2004) ............................................................8, 9

*In re Salomon Analyst Level 3 Litig.*,
   350 F. Supp. 2d 477 (S.D.N.Y. 2004) .................................................................7

*In re Silicon Graphics Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999).................................................................6, 13, 14

*In re Software Toolworks Inc.*,
   50 F.3d 615 (9th Cir. 1994) .............................................................................. 15

*In re Stac Elecs. Sec. Litig.*,
   89 F.3d 1399 (9th Cir. 1996) ..............................................................................3

*In re Textainer P'ship Sec. Litig.*,
   No. C-05-0969, 2005 U.S. Dist. LEXIS 40974 (N.D. Cal. Dec. 12, 2005) .......13

*In re Time Warner Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993) .................................................................................12

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) ............................................................................7

*In re Verifone Securities Litigation*,
   784 F. Supp. 1471 (N.D. Cal. 1992)..................................................................10

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994) ........................................................................... 15

*Knievel v. ESPN*,
   393 F.3d 1068 (9th Cir. 2005) ............................................................................3

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) .............................................................................17

*Marx v. Computer Sciences Corp.*,
   507 F.2d 485 (9th Cir. 1974) ..............................................................................8

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ...............................................................14, 18, 19

*Patel v. Parnes*,
   253 F.R.D. 531 (C.D. Cal. 2008)........................................................................13

*Podany v. Robertson-Stephens, Inc.*,
   318 F. Supp. 2d 146 (S.D.N.Y. 2004) ................................................8, 9, 10, 15

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ..............................................................................14

*Rudolph v. UTStarcom*,
   2008 U.S. Dist. LEXIS 63990 (N.D. Cal. 2008)................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) ...........................14, 18

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083, 111 S. Ct. 2749, 115 L. Ed. 2d 929 (1991) ................................8

*Williams v. Sinclair*,
   529 F.2d 1383 (9th Cir. 1975) ...........................................................................19

**STATUTES AND RULES**

Private Securities Litigation Reform Act, 15 U.S.C.
   § 78u-4 ("PSLRA") ....................................................................................passim

15 U.S.C.
   § 78j (1934)...........................................................................................................6
   § 78u-4(b)(1), (2) .................................................................................................7
   § 78u-4(b)(2)....................................................................................................7, 13
   § 78u-4(b)(4)......................................................................................................18

17 C.F.R. § 240.10b-5 (1948)....................................................................................6

Federal Rule of Civil Procedure 9(b)...........................................................................6

Federal Rule of Civil Procedure 12(b)(6)....................................................................3

## DEFENDANT SANDLER O'NEILL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

Defendant Sandler O'Neill & Partners, L.P. ("Sandler O'Neill") submits this memorandum in support of its Motion to Dismiss Plaintiff's Class Action Complaint in Shotke v. Pacific Capital Bancorp, et al (the "Shotke Complaint" or "Complaint").

## I.    PRELIMINARY STATEMENT

The Complaint in the Shotke case is almost word-for-word identical to the complaint in Jurkowitz v. PCBC.   The only differences are in paragraphs ¶¶ 37-39 (which do not relate to Sandler O'Neill) and the allegations regarding the dates on which Mr. Shotke purchased and sold his PCBC securities (Complaint Appendix A).  As a result, the arguments raised in this motion to dismiss are almost entirely identical to the arguments made in the motion to dismiss the Jurkowitz complaint, which is already fully briefed and submitted before the court.  To maximize the Court's time, this memorandum will first highlight those factual differences and the impact they have on the analysis.  The grey shading below shows the time periods when either plaintiff held PCBC stock.

| Date | Event | Jurkowitz | Shotke |
|------|-------|-----------|--------|
| May 12 – 17 | | | Initial purchases |
| June 2 | | | Sale |
| June 9 | | | Sale of remaining shares |
| June 17 | Sandler O'Neill "Buy" Recommendation | | |
| June 17 | | Initial purchase | |
| June 22 | PCBC announces dividend suspension | Sale of all shares | |
| June 23 | | | Purchases again |
| June 25 | Rachel Beck Article published, quoting analyst Aaron Deere | | |
| July 1 | | | Addn'l purchases |
| July 6 | | | Sale of all shares |
| July 7-12 | | | |
| July 13-16 | | | Purchases again |

| July 30 | PCBC discloses additional provisions for bad loans; end of class period | | |
|---------|------------------------------------------------------------------------|--|--|

As can readily be seen, Shotke did not purchase any shares in reliance on the Sandler O'Neill Buy recommendation. He sold all of his shares by June 9, before the Buy recommendation was issued. He did not repurchase immediately after the Buy was issued on June 17. Whatever it was that caused Shotke to jump in and out of the market for PCBC shares in small increments throughout the summer of 2009, it does not appear to have been the Buy recommendation. [1]

Second, Shotke did not re-purchase PCBC shares until June 23, 2009, the day <u>after</u> PCBC announced it was suspending dividend payments. That is highly significant to the issue of loss causation. Both Jurkowitz and Shotke allege that the Buy recommendation was "false" because it was issued recklessly, without taking into account the risk that PCBC would have to suspend dividends. But even assuming Sandler O'Neill made a mistake by failing to consider the dividend risk when it issued the Buy recommendation, that mistake could not have harmed Shotke. By June 23 the dividend suspension had already occurred and been disclosed to the market. The dates of Shotke's purchases and sales make his Complaint even weaker than Jurkowitz's.

The facts unique to the Shotke Complaint are reflected in the argument below at page 12 (section B.2) and pages 19-20 (section D.2). Otherwise the arguments in this memorandum are the same as those in the motion to dismiss the Jurkowitz case, because the complaints are the same.

---

[1] Shotke claims to have purchased four hundred shares of PCBC stock on various days between May 12, 2009 and May 27, 2009. (Compl. at App. A.) He sold 200 of those shares on June 2, 2009, and sold the remaining 200 shares on June 9, 2009. *Id.* He then purchased 100 shares of PCBC stock on June 23, 2009 and another 50 shares on July 1, 2009. *Id.* He sold all 150 shares on July 6, 2009. *Id.* On July 13, 2009 Plaintiff again purchased 100 shares of PCBC stock and purchased an additional 200 shares and 100 shares on July 15, 2009 and July 16, 2009, respectively. *Id.*

## II.    STATEMENT OF RELEVANT FACTUAL ALLEGATIONS

**A.    The Parties**

Plaintiff purports to represent a class of persons purchasing PCBC shares from April 30, 2009 until July 30, 2009 – the same as the *Jurkowitz* Complaint.  (*Id.* at ¶ 1.)

**B.    Sandler O'Neill's Buy Recommendation**

Aaron James Deer, who is not named as a defendant, is a Sandler O'Neill analyst who from time to time authored research reports called "Company Notes" covering PCBC, including the June 17, 2009 Company Note that recommended PCBC stock as a Buy.  (*Id.* at ¶ 42.)  A true and correct copy of the Note is attached to the Declaration of Aaron Deer ("Deer Decl.") as Exhibit A.[2]  That Note states, *inter alia*:

> Raising Rating to BUY from HOLD.  The stock of Pacific Capital Bancorp has dropped precipitously over the past two months to a discount that we believe is unwarranted.  At yesterday's close, PCBC shares were trading at just 40% of tangible common book value, while the median community bank was trading at about 95% of tangible common book value.  While perhaps some discount is justified due to the company's California footprint, we think it is overdone given the Company's countervailing capital strength and the untapped value of the central coast franchise.

(Deer Decl. Ex. A at 3.)

---

[2] Because the contents of the Company Note are alleged in the Complaint and its authenticity has not been questioned, this Court may consider the full document in ruling on a motion under Federal Rule of Civil Procedure 12(b)(6) without converting the motion into a motion for summary judgment.  *See Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), overruled on other grounds, 307 F.3d 1119, 1127 (9th Cir. 2002); *see also In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n. 4 (9th Cir. 1996) ("[t]he district court considered the full text of the prospectus, including portions which were not mentioned in the complaints.  We note that such consideration is appropriate in the context of a motion to dismiss…."); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (noting that the "incorporation by reference" doctrine to extends to situations in which the plaintiff's claim depends on the contents of a document).

1         The Complaint contains no allegation regarding the impact of the Buy

2    recommendation on the price of the shares.  While it states that PCBC stock was trading at

3    $6.94 on April 30 (Compl. at ¶ 3), it never says what the price was on the day the Buy was

4    issued, or the days immediately before or afterward.  (*Id.* at ¶ 35.)

5    **C.**      **PCBC's June 22, 2009 Announcement**

6         Five days later, on June 22, 2009, PCBC filed a Form 8-K with the SEC

7    announcing that it was deferring regularly scheduled interest payments on subordinated

8    notes relating to its trust preferred securities, and likewise suspending the payment of

9    dividends on its common and preferred stock.  (*Id.* at ¶ 36.)

10         Plaintiff  purchased 100 shares of PCBC stock, the day after this announcement, on

11    June 23, 2009. (*Id.* at App. A.)

12    **D.**      **The James Deer Interview**

13         On Saturday, June 27, 2009 the Associated Press published a news report titled

14    "Investors' Tools to Understand Banks" by Rachel Beck, which included a discussion of

15    PCBC and an interview the journalist had with Mr. Deer.  (*Id.* at ¶¶ 41-42.)  A true and

16    correct copy of that article is attached as Exhibit B to the Deer Declaration.[3]  Notably, the

17    interview mentions that Mr. Deer was not the only analyst who upgraded PCBC stock

18    during the week of June 15, 2009.  (Deer Decl. Ex. B at 9.)  The article stated, *inter alia*:

19                 That advice comes from Aaron James Deer, the Sandler

20                 O'Neill & Partners bank analyst who admirably agreed to be

21                 interviewed even after he found himself on the wrong side of a

22                 stock recommendation this month.  The company involved is

23                 Pacific Capital Bancorp, a bank holding company

24                 headquartered on the central coast of California. Its shares had

25                 been cut in half over [sic] in recent months to under $4 each,

26

27    _____

[3] Because Plaintiff quoted from the article in his Complaint, the Court may consider the full article for context on this pleading motion, based on the authorities cited in footnote 1, *supra*.

28

1  and some analysts including Deer thought that price level was

2  unwarranted.

3  So Deer – <u>as well as Keefe, Bruyette & Woods' analyst</u>

4  <u>Julianna Balicka</u> – upgraded the stock during the week of June

5  15. Deer's rationale was that the bank had capital strength and

6  reorganized its operations to bring in fresh talent. He also cited

7  evidence that Pacific Capital's commercial real estate portfolio

8  was performing well.  Deer also had met with Pacific Capital's

9  management a week before issuing his upgrade.  Wall Street

10  analysts don't change their stock ratings often. So <u>imagine</u>

11  <u>Deer's surprise when bad news hit days later</u>. Pacific Capital

12  announced on June 22 that it had suspended all dividend

13  payments to common and preferred shareholders. The latter

14  group includes the U.S. government,

15  which extended a loan to the bank under the Troubled Asset

16  Relief Program's Capital Purchase Plan.

17  (*Id.*) (emphasis added.)

18      Plaintiff fails to quote the above language from the article, but does quote the

19  language which says, "Deer acknowledged in an interview that his upgrade was the wrong

20  call." (Compl. ¶ 42.)  Later, the Complaint alleges that "the analyst admitted that there

21  were certain simple calculations and regulatory rules that could have been utilized to

22  foresee the Company's difficulties" (Compl.  ¶ 70), although that is not a quote from the

23  article or even a paraphrase, but rather a conclusion Plaintiff would ask the Court to draw

24  the article as a whole.  The article does <u>not</u> state that Mr. Deer knew his Buy

25  recommendation was wrong at the time he issued it.   The Complaint does not allege what

26  effect the Beck article had on the market price of PCBC stock.

27  **E.    PCBC's 2Q 2009 Results**

28      On July 30, 2009, the Company filed a Form 8-K with the SEC and issued a press

1    release announcing negative financial results for the quarter ending June 30, 2009,

2    especially an increase in the allowance for loan losses.  (*Id.* at ¶¶ 44, 46-48.)  That

3    disclosure marks the end of the class period.   The Complaint nowhere alleges that

4    Sandler O'Neill had any advance knowledge of the negative news disclosed at that time.

5    On July 31, 2009, Sandler O'Neill issued another research report written by Mr. Deer

6    downgrading PCBC stock to "Hold."  (Compl. ¶ 57.)

7        Based on the above, Plaintiff claims that Sandler O'Neill committed securities

8    fraud.

9                        **III.   ARGUMENT**

10   **A.    Plaintiff Must Satisfy Exacting Pleading Standards to Avoid Dismissal**

11       To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiff

12   must allege six elements: (1) a material misrepresentation (or omission); (2) scienter; (3) a

13   connection with the purchase or sale of a security; (4) reliance, (5) economic loss; and

14   (6) loss causation, *i.e.*, a causal connection between the material misrepresentation and the

15   loss.  15 U.S.C. § 78j (1934); 17 C.F.R. § 240.10b-5 (1948); *see also Dura Pharm., Inc. v.*

16   *Broudo*, 544 U.S. 336, 341-42, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005).

17       Additionally, Section 10(b) claims must comply with the pleading standards of

18   Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act, 15

19   U.S.C. §78u-4 ("PSLRA").  Under Rule 9(b) "[t]he plaintiff must set forth what is false

20   and misleading about a statement" and "an explanation as to why the disputed statement

21   was untrue or misleading when made." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541,

22   1548-49 (9th Cir. 1994) (*en banc*) (emphasis added).  The plaintiff must also show that

23   the statement was made with an intent to deceive investors or with "deliberate

24   recklessness," a "degree of recklessness that strongly suggests actual intent" to deceive

25   investors.  *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 977, 979 (9th Cir. 1999)

26   (emphasis added).

27       The PSLRA requires plaintiff to plead both falsity and scienter with particularity.

28   15 U.S.C. § 78u-4(b)(2); *see also In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084-85

(9th Cir. 2002) *quoting In re Silicon Graphics*, 183 F.3d at 988 (9th Cir. 1999)("The purpose of this heightened pleading requirement was . . . to put an end to the practice of pleading 'fraud by hindsight.'").  In order to avoid dismissal, the Complaint must (1) specify each misleading statement, (2) specify "the reason or reasons why the statement is misleading," and (3) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *i.e.*, scienter.  15 U.S.C. §78u-4(b)(1), (2).  The Complaint does not come close to satisfying this standard.

**B.**     **Plaintiff Fails to Plead a Material False or Misleading Statement of Fact**

The only false statement alleged against Sandler O'Neill is the single word "Buy" plucked from the June 17, 2009 Company Note.  Plaintiff ignores the full text of the Note, and the controlling authorities regarding how courts should assess the falsity of opinions and projections such as this Buy recommendation.

1.    The Complaint Fails to Identify a False Statement of Material Fact and Provide Reasons Why it is False or Misleading

Stock recommendations such as "Buy," "Sell," or "Hold" reflect an analyst's opinion about the future performance of a stock.  *See e.g. In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 490 (S.D.N.Y. 2004); *DeMarco v. Lehman Bros. Inc.*, 309 F. Supp. 2d 631 (S.D.N.Y. 2004); *In re Credit Suisse First Boston (Agilent Techs., Inc.) Analyst Reports Sec. Litig.*, 431 F.3d 36, 47 (1st Cir. 2005)("Although these ratings are based to some degree on objective facts, they ultimately convey an opinion about a stock's prospects and perhaps about the likely proclivities of the stock market over a given period.").  The June 17 Company Note states: "In the opinion of our analyst, a stock rated BUY is materially undervalued and represents an attractive investment candidate. The analyst expects the stock to appreciate by more than 10% within the next 12 months." (Deer Decl. Ex. A at 7.) (emphasis added).

Under Ninth Circuit precedent, such a "projection or statement of belief may be actionable only to the extent that one of three implied factual assertions is inaccurate: '(1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief,

1    and (3) that the speaker is not aware of any undisclosed facts tending to seriously

2    undermine the accuracy of the statement.'"  *Hanon v. Dataproducts Corp.*,  976 F.2d 497,

3    501 (9th Cir. 1992) *quoting In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th

4    Cir. 1989).  The fact that the prediction proves to be wrong in hindsight does not render

5    the projection or opinion untrue when made. *Marx v. Computer Sciences Corp.*, 507 F.2d

6    485, 489-90 (9th Cir. 1974).

7         The Complaint fails all three prongs of the Ninth Circuit test for a false opinion.

8              a.    Plaintiff Fails to Alleged that the Buy Recommendation Was
9                    Subjectively False

10        The first prong of the test requires subjective falsity, *i.e.*, plaintiff must plead that

11   the maker of an opinion statement did not subjectively believe his own opinion.  It is not

12   sufficient to plead that an optimistic opinion was not borne out by later developments.

13   *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095-1096, 111 S. Ct. 2749,

14   115 L. Ed. 2d 929 (1991); *see also In re Credit Suisse First Boston (Agilent Techs., Inc.)*,

15   431 F.3d at 47 (explaining that courts have applied the reasoning of *Virginia Bankshares*,

16   to section 10(b) claims alleging false and misleading opinions).  Neither is it sufficient to

17   allege that an opinion was unreasonable, excessively optimistic "or any other

18   characterization that relies on hindsight or falls short of an identifiable gap between the

19   opinion publicly expressed and the opinion truly held."  *In re Salomon Analyst AT&T*

20   *Litig.*, 350 F. Supp. 2d 455, 466 (S.D.N.Y. 2004); *see also Podany v. Robertson-Stephens,*

21   *Inc.*, 318 F. Supp. 2d 146, 154, (S.D.N.Y. 2004) ("it is not sufficient to allege…that it

22   would have been possible to reach a different opinion than that reached by defendant at

23   the time, or even that the defendant's opinion was unreasonable.").

24        In the present case Plaintiff fails to plead any facts establishing that Mr. Deer

25   secretly held an opinion regarding PCBC stock on June 17 contrary to the Buy

26   recommendation he issued that day.  At most Plaintiff pleads that in an interview

27   published ten days later he "acknowledged . . . that his upgrade was the wrong call."

28   (Comp. ¶ 42.)  Admitting that an opinion predicting the future did not turn out well is not

an admission of fraud.  This deficiency is fatal, and the Complaint must be dismissed.  *See In re Credit Suisse (Agilent Tech., Inc.)*, 431 F.3d at 48, n.4 ("If a complaint does not successfully plead subjective falsity, it fails to pass muster under the PSLRA."); *In re McKesson HBOC Secs. Litig.*, 126 F. Supp. 2d 1248, 1265 (N.D. Cal. 2000)(noting that allegations of objective falsity without allegations that an "opinion was not sincerely held" are insufficient to state a claim because "the securities laws do not create a general cause of action for negligence by investment advisors").[4]

> b.    Plaintiff Fails to Allege that the Analyst Made the Statement Without Any Reasonable Basis

Plaintiff likewise fails to plead that there was no reasonable basis for the Buy recommendation, and therefore has not pled falsity under the second prong of the Ninth Circuit test.  While Plaintiff omitted to attach the full Company Note to the Complaint, the Buy recommendation must be considered within the context of the entire research report of which it was a part.  *See In re Credit Suisse First Boston (Agilent Tech., Inc.) Analyst Reports Sec. Litig.*, No. 02-12056, 2005 U.S. Dist. LEXIS 6345 at *14-15 (D. Mass. Mar. 31, 2005) (rejecting plaintiffs' contention that the buy recommendations alone, and not the full analyst reports in which they were made, should be the focus of the court's falsity analysis).

The Company Note provides the rationale for Mr. Deer's Buy recommendation.  In it Mr. Deer states that PCBC shares are trading at a much lower ratio of stock price to "tangible common book value" than other community banks; he believes the price of PCBC shares will rise until they reflect a valuation closer to that of other community banks, measured on that basis.  (Deer Decl. Ex. A at 3.)  He discusses personnel changes which he believes strengthened the bank.  (*Id.*)  He discusses plans to improve PCBC's

---

[4] *See also e.g. In re Salomon Analyst AT&T Litigation*, 350 F. Supp. 2d at 465-466 ("to survive a motion to dismiss on a false statement of opinion claim, a plaintiff must allege with particularity provable facts to demonstrate that the statement of opinion is both objectively and subjectively false.")(internal quotations and citations omitted); *Podany*, 318 F.Supp.2d at 154, 155-56 ("the *sine qua non* of a securities fraud claim based on false opinion is that defendants deliberately misrepresented a truly held opinion.").

1    "refund anticipation loan" program.  (*Id*. at 4.)  And he cites to various positive statements

2    made by PCBC management regarding their credit practices, including management's

3    plan to keep its reserve ratio above 2.5%, and its practice of aggressively writing down

4    problem loans.  (*Id.*)  Finally, he notes that the company is improving its capital ratios by

5    shrinking its balance sheet. (*Id.*)[5]

6          Plaintiff makes no attempt to negate the multiple bases for the Buy expressed in the

7    Note.  Plaintiff only alleges that the analyst should have also taken one <u>additional</u> factor

8    into account – a purported rule (authority for which is not cited in the Complaint) that

9    limits a bank's ability to pay dividends based on its net income over the past two years.

10   Plaintiff never alleges <u>why</u> this factor would necessarily preclude an analyst from

11   recommending PCBC as a Buy.  Plaintiff cannot ask the Court to just assume that a

12   company temporarily suspending dividends to improve its capital structure can never be a

13   good buy, no matter how low its share price.

14         Moreover, the failure to consider one fact which might have changed the analysis

15   does not deprive a forecast or opinion of its "reasonable basis."  S*ee In re Caere*

16   *Corporate Securities Litigation*, 857 F. Supp. 1054, 1060 ( N.D. Cal. 1993) (A forecast

17   doesn't lack a "reasonable basis" merely because other contrary forecasts also exist within

18   the company); *accord*, *In re Verifone Securities Litigation*, 784 F. Supp. 1471, 1487 (N.D.

19   Cal. 1992).

20         Plaintiff's allegations are insufficient to state a claim for securities fraud.  "A

21   securities fraud action may not rest on allegations that amount to second guesses of

22   defendants' opinions about the future value of issuers' stock – second-guesses made all

23   too easy with the benefit of hindsight."  *Podany*, 318 F. Supp. 2d at 154; *see also In re*

24   *GlenFed*, 42 F.3d at 1549 (plaintiffs must "elaborate circumstances contemporary to the

25   alleged false statement to explain how and why the statement was misleading when

26

27   &#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;

[5] Allowing CDs and other deposits to run off when they mature reduces total liabilities, but does not alter the company's capital; it therefore has a favorable impact on ratios measuring capital to liabilities.

28

---

made.").  Under the PSLRA Plaintiff must "specify the reason or reasons the statement is misleading," but in this Complaint he never pleads facts demonstrating that there was no reasonable basis for the Buy recommendation as of June 17, 2009.

> c.     Plaintiff Fails to Allege that the Analyst Made the Buy Recommendation Despite Actual Awareness of Contrary Undisclosed Factors

The Complaint likewise fails the third prong of the Ninth Circuit test, which requires Plaintiff to allege that the opinion was reckless in the sense that the analyst was actually aware of facts that would seriously undermine "the accuracy of the statement," yet issued it anyway without disclosing them.  *Hanon*, 976 F.2d  at 501.   In opposing the prior motion to dismiss, plaintiff Jurkowitz, represented by the same counsel on an identical complaint, did not argue that this prong of the Ninth Circuit test was pled.  As a result, it will not be discussed further here.  It will be addressed in reply if Shotke deviates from the arguments previously made on behalf of Jurkowitz.

> 2.     Plaintiff Has Not Adequately Pled that the Failure to Downgrade the Stock Was An Actionable False Statement

Plaintiff pleads that Sandler O'Neill "carried forward an ongoing falsehood" in failing to amend its Buy recommendation as soon as the dividend suspension was announced on June 22.  (Compl. ¶ 67.)  Plaintiff's "ongoing falsehood" theory is deficient, first, because there was no adequate pleading of an initial falsehood, as described above.

Second, as already stated above, Plaintiff has not pled facts establishing that the stock could not have been the subject of a legitimate Buy recommendation after the June 22 dividend suspension announcement.  Plaintiff clearly assumes that once a company announces bad news its stock must automatically be downgraded to "Sell" or it is fraud.  Plaintiff's assumption is wholly erroneous and fails to account for Sandler O'Neill's disclosed bases for ratings, as described below.  Moreover, that assumption is completely inconsistent with Shotke's own behavior.  He purchased PCBC shares on June 23, the day

1  after the suspension of dividends was announced.  And he bought additional shares

2  shortly after the Rachel Beck article was published.  Shotke cannot claim that the

3  announcement of a dividend suspension rendered the failure to withdraw the Buy

4  misleading, as his own investment pattern implies that Shotke himself still thought the

5  stock was a good investment after the June 22 announcement.

6      Plaintiff's argument ignores what a "Buy" recommendation means.  As stated in

7  the Company Note itself, a Buy does not mean the company is perfect; it means that the

8  analyst predicts that its stock price will go up by more than 10% in the next twelve

9  months.  (Deer Decl. Ex. A at 7.)   On that measure, a blue chip company whose stock is

10  expensive may not be a Buy; a company whose stock price has been pushed down by bad

11  news may be a Buy.  A Buy isn't a credit rating; it's a prediction of future market

12  movement, with all the uncertainty that entails.  Plaintiff has failed to plead facts

13  indicating that PCBC could not legitimately be recommended as a Buy after the dividend

14  suspension was disclosed to the market on June 22.

15      Moreover, while certain courts outside of the Ninth Circuit have recognized that "a

16  duty to update opinions and projections may arise if the original opinions or projections

17  have become misleading as the result of intervening events," such a duty does not extend

18  to statements without "definite positive projections," such as predicted completion dates

19  or the probability of a successful deal.  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267

20  (2d Cir. 1993).  The June 17 Buy recommendation at issue here "lack[s] the sort of

21  definite positive projections that might require later correction."  ***See In re Credit Suisse***

22  ***First Boston (Agilent Tech., Inc.)***, 2005 U.S. Dist. LEXIS 6345 at *12 ("The simple word

23  'Buy' taken by itself does not supply much substantive content.  Buy at what price?  Buy

24  in pursuit of what investment strategy?  Buy in combination with what other portfolio

25  holdings?").  Moreover, the June 17 Company Note itself clearly states, "[t]he

26  information, opinions or recommendations contained in [the] report <u>speak only as of the</u>

27  <u>date of this report</u> and are subject to change without notice.  (Deer Decl. Ex. A at 7.)

28  (emphasis added.)

Further, there is no allegation that Sandler O'Neill's failure to issue a Company Note downgrading PCBC to Hold until July 30 hid any <u>fact</u> from the market.  Plaintiff does, however, affirmatively plead that the analyst gave a press interview, published on the Internet, in which he disclosed to the world that the Buy was the "wrong call."  To the extent it was the wrong call due to failure to take into account the risk of a dividend suspension, the dividend suspension itself was publicly disclosed by PCBC's own press release.[6]  And the fact that Mr. Deer issued the Buy without consideration of the purported two year net income rule for dividends was fully disclosed to the market on June 27.  Plaintiff has not pointed to a single fact that was hidden from the market due to Sandler O'Neill's conduct.

In short, Plaintiff has pleaded no facts indicating that failure to withdraw or downgrade the Buy was an actionable misrepresentation.

**C.**  <u>**Plaintiff Fails to Plead Facts Supporting a Strong Inference of Scienter**</u>

The PSLRA imposes a rigorous pleading standard to enforce the distinction between fraudulent intentional conduct, which is actionable, and merely negligent conduct or "fraud by hindsight," which is not. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201, 96 S. Ct. 1375; 47 L. Ed. 2d 668 (1976). (no § 10(b) liability for negligence alone).

To avoid dismissal, the Complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  The state of mind in question is "scienter," meaning an "intent to deceive, manipulate, or defraud." *Ernst & Ernst*, 425 U.S. at 193 n. 12.    Plaintiff must show either conscious intent to defraud or a high degree of recklessness. *See In re Silicon Graphics*, 183 F.3d at 974.  "[R]ecklessness only satisfies scienter under § 10(b) to the extent it reflects some degree of <u>intentional or knowing misconduct</u>." *Id.* at 976-77.  In other words, the plaintiff must plead highly unreasonable conduct "involving not merely

---

[6] *See In re Textainer P'ship Sec. Litig.,* No. C-05-0969, 2005 U.S. Dist. LEXIS 40974, at * 20, 21  (N.D. Cal. Dec. 12, 2005) (securities laws do not require disclosure of information that is readily available in the public domain (citing cases)); a*ccord Patel v. Parnes*, 253 F.R.D. 531 (C.D. Cal. 2008).

1    simple, or even inexcusable negligence, but an extreme departure from the standards of

2    ordinary care, and which presents a danger of misleading buyers or sellers that is either

3    known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at

4    974 (*quoting Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990)).  To

5    satisfy this pleading requirement, "the complaint must contain allegations of specific

6    'contemporaneous statements or conditions' that demonstrate the intentional or the

7    deliberately reckless[,] false or misleading nature of statements when made." *Ronconi v.*

8    *Larkin*, 253 F.3d 423, 432 (9th Cir. 2001).

9         In determining whether the facts pled support a <u>strong inference</u> of scienter, a court:

10             must engage in a comparative evaluation; it must consider, not

11             only inferences urged by the plaintiff . . . but also competing

12             inferences rationally drawn from the facts alleged. An inference

13             of fraudulent intent may be plausible, yet less cogent than

14             other, nonculpable explanations for the defendant's conduct.

15             To qualify as "strong" within the intendment of [the

16             PSLRA]…an inference of scienter must be more than merely

17             plausible or reasonable--it must be cogent and at least as

18             compelling as any opposing inference of nonfraudulent intent.

19    *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 127 S. Ct. 2499, 168 L.

20    Ed. 2d 179 (2007).

21         While the Court will assume that the facts in the Complaint are true, "it is not

22    required to indulge unwarranted inferences in order to save a complaint from dismissal."

23    *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064-65 (9th Cir. 2008)

24    *citing In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996).

25         1.    <u>Failure to Consider "Simple Calculations and Regulatory Rules"</u>

26         In this case, Plaintiff makes three attempts to support a "strong inference" of

27    scienter, none of which is sufficient.  First, Plaintiff alleges that there were "certain simple

28    calculations and regulatory rules that could have been utilized to foresee the Company's

difficulties" and that Mr. Deer admitted, in the Rachel Beck interview, that he did not consider one such factor.  (Compl. at ¶ 70.)

This allegation is really one of negligence; that the analyst <u>failed to consider</u> a factor which he should have considered (and, according to Rachel Beck at least, which he admitted in hindsight he should have considered), not that he rendered an opinion he did not believe, or that he swept a negative factor of which he was actually aware under the rug without disclosing it.  Plaintiff alleges that Sandler O'Neill failed to conduct "the kinds of analyses that analysts typically – and admittedly – perform in assessing the financial condition of a bank."  (Compl. at ¶ 42.)  Plaintiff alleges that the Buy was not "reasonable."  (*Id.* at ¶ 43.) ("Deer clearly had access to all the information he needed to make a <u>reasonable</u> recommendation or to refrain from issuing a recommendation.").  The allegation that an analyst made a professional error falls far short of what is necessary to state a claim for securities fraud.  *See Podany*, 318 F. Supp. 2d at 156 ("ultimate inaccuracy" of an analyst's opinion doesn't support an inference of scienter.); *see also In re Software Toolworks Inc.*, 50 F.3d 615, 627-28 (9th Cir. 1994) (mere professional mistakes such as misapplication of accounting principles do not support a strong inference that an accounting firm acted with scienter.); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426-27 (9th Cir. 1994) (allegation that accountant improperly recognized revenue in violation of GAAP and that the failure was "so obvious that . . . [the accounting firm] must have been aware of it" was not evidence of scienter because it was a conclusory opinion "not based on specific facts that shed light on the mental state of the accountants");  *Dsam Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) (allegations that an auditor failed to see egregious and obvious GAAP errors relating to millions of dollars of improper revenue recognition only pled "a compelling case of negligence - perhaps even gross negligence.").[7]

---

[7]  Plaintiff's argument is self defeating.  If the impact of the two year net income rule was <u>so obvious</u> that ignoring it was equivalent to fraud, then other analysts and market professionals must have been aware of it as well, and it would have been digested by the "efficient market" pled by Plaintiff.  Deer is not alleged to have had unique access to it.  The information needed to apply the rule is described in the Complaint as "simple

1

2.      Failure to Downgrade After "Admitting" the Buy was "Wrong"

2

Plaintiff next pleads that the failure to downgrade PCBC to "Hold" or "Sell" after

3

Mr. Deer allegedly admitted in the Beck interview that the Buy was "the wrong call"

4

demonstrates scienter.  (*Id.* at ¶ 71.)  That allegation does not support a strong inference of

5

scienter.  As already discussed at p. 12, *supra*, Plaintiff cannot ask the Court to simply

6

assume that Mr. Deer could not have considered PCBC a Buy after the dividend

7

suspension.  Plaintiff nowhere alleges what Mr. Deer thought about PCBC after the

8

dividend suspension was announced.  The Rachel Beck article, for example, says nothing

9

about whether Mr. Deer still thought the stock was a Buy.

10

Moreover, because the Plaintiff relies so heavily on the Rachel Beck article, it is

11

fair to ask what inference that article really supports.  What securities professional whose

12

mental state is an intent to defraud would rush out and give an interview to a journalist

13

immediately after the June 22 press release and admit that they "got it wrong" when they

14

recommended PCBC as a Buy?[8]  If Mr. Deer's intent was to artificially boost the stock

15

price, why candidly admit to Beck that he failed to consider the two year earnings test in

16

making his Buy recommendation?  That chain of events is inconsistent with the inference

17

that Aaron Deer was bent on fraud.  The more plausible inference is the obvious one – he

18

did not immediately withdraw the Buy because he still gave weight to the positive factors

19

referenced in the June 17 Note, none of which were disproven by the temporary

20

suspension of dividends, and with the stock price even further depressed he reasonably

21

concluded it would eventually go back up.

22

23

24

calculations and regulatory rules." (Compl ¶ 70.)  Plaintiff fails to allege that anything

25

Deer did deprived the market of access to this information.

26

[8] The Court may consider the Rachel Beck article on this motion to dismiss because

27

Plaintiff has brought it before the Court and made it part of the pleadings by quoting
from it in his Complaint.  However, to the extent the article purports to quote Mr. Deer, it
is pure hearsay.  Sandler O'Neill does not concede its accuracy or admissibility on the

28

merits.

3.    <u>The Disclosed Investment Banking Relationship Does Not Support a</u>
<u>Strong Inference of Scienter</u>

Finally, the Complaint pleads that "[s]cienter on the part of the Analyst Defendants is demonstrated by the fact that they benefitted from their false or reckless statements about PCBC common stock, as they were retained by the Company by the end of the Class Period to serve as financial advisor…" (Compl. at ¶ 72.)

This vague and peculiar formulation – "they were benefitted … as they were retained" – makes the weakest and most limited possible claim:  that after making the Buy recommendation Sandler O'Neill was then hired to provide other services.  It does not allege that the Buy recommendation was made <u>in order to be retained</u>, or that there was any explicit *quid pro quo* between a favorable recommendation and the retention for financial advisory services.  That is not fraud.

Even stretching to read this as an attempt to plead motive, it is not enough.  In order "to allege a 'strong inference of deliberate recklessness,' [the plaintiff] 'must state facts that come <u>closer to demonstrating intent, as opposed to mere motive and opportunity</u>.'" *Dsam Global Value Fund*, 288 F.3d at 388 (*quoting In re Silicon Graphics*, 183 F.3d at 974) (emphasis added).  Pleading of a "generalized motive" is insufficient to establish scienter.  *Rudolph v. UTStarcom*, 2008 U.S. Dist. LEXIS 63990 at * 14 (N.D. Cal. 2008) (allegations of intent based upon generalized financial motives are insufficient to establish scienter); *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 171 (2d Cir. 2005) (suggesting that although conflicts of interest present opportunities for fraud, they cannot, without more, furnish the basis of a fraud complaint); *accord In re Credit Suisse (Agilent Tech., Inc.) Analyst Reports Sec. Litig.*, 431 F.3d at 49.

In *Tellabs*, the leading case on what it means to plead a "strong inference," the Supreme Court instructed that all the facts must be examined "holistically" to see what inference they support.  *Tellabs, Inc.*, 551 U.S. at 326.  Viewing all the facts pled here as a whole, they do not support a strong inference that anyone at Sandler O'Neill acted with an intent to defraud.

**D.**    **Plaintiff Fails To Plead Loss Causation**

The PSLRA requires that a plaintiff demonstrate loss causation by showing that "the act or omission of the defendant alleged to violate this title caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).  To plead loss causation plaintiff "must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff."  *In re Gilead Sciences Securities Litigation*, 536 F.3d 1049, (9th Cir. 2008) (*quoting In re Daou Sys. Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005).  Thus, a securities fraud complaint must set forth allegations that show that the drop in stock price was causally related to the material misrepresentation. *Metzler*, 540 F.3d at 1062.

It is not adequate for a plaintiff merely to allege that the price paid for a security was inflated as a result of a defendant's misrepresentations.  *Dura*, 544 U.S. at 342. Rather, a plaintiff must identify the alleged fraudulent statement that artificially inflated the stock price, as well as the corrective disclosure (i.e., revelation of the prior fraud) that subsequently drove the price down. *See Dura*, 544 U.S. at 347; *In re Daou*, 411 F.3d at 1027; *Metzler*, 534 F.3d at 1064.  Plaintiff must sufficiently allege that the market reacted to the disclosure of new facts that revealed a previous representation to have been fraudulent, and not merely to reports of a defendant's poor financial health generally. *See Metzler*, 540 F.3d at 1063.

The Complaint fails to allege how the drop in PCBC's stock price was in any way causally related to the allegedly false Buy recommendation or what corrective disclosures were made related to that recommendation that drove the stock price down.  This is not sufficient. *See Dura*, 544 U.S. at  347 (complaint fails to allege loss causation when it does not "provide[ ] [a defendant] with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation…")

1.    Plaintiff Fails to Plead that the Buy Inflated the Price of PCBC Shares

Plaintiff makes no attempt to allege that the Buy recommendation affected the stock price in any way.  Paragraph 35 of the Complaint, which pleads that Sandler O'Neill

upgraded the stock to Buy, makes no claim that the stock price went up or became inflated in response to this purported material false statement.

2.    Plaintiff Fails to Plead that the Disclosure of the Purported Falsity of the Buy Opinion Caused Any Economic Loss

The Complaint fails to identify any corrective disclosure of the falsity of the "Buy" and thus, on its face, is deficient in its pleading of loss causation. *See Dura*, 544 U.S. at 347; *In re Daou*, 411 F.3d at 1027; *Metzler*, 534 F.3d at 1064.

Moreover, Plaintiff's allegations about his own stock trading history defeat loss causation. Plaintiff alleges that the Buy recommendation was false because it was made recklessly, without considering the risk that PCBC would be unable to pay dividends. According to Plaintiff, if Sandler O'Neill had performed a "proper" analysis it would have realized that dividends would not be paid. (Compl. at ¶ 42.) In other words, Sandler O'Neill is responsible for Plaintiff's loss because its Buy recommendation covered up that risk. However, the facts pled by Plaintiff are fatal to his claim.

First, Plaintiff bought and sold four hundred shares of PCBC stock between May 12, 2009 and June 9, 2009. Plaintiff cannot state a claim for those stock purchases because they occurred before the Buy recommendation was even issued on June 17. *See Williams v. Sinclair*, 529 F.2d 1383, 1389 (9th Cir. 1975) (allegedly fraudulent acts which occur after a plaintiff's purchase of stock cannot form the basis of a section 10(b) claim because the acts were not performed in connection with the purchase or sale of securities).

Plaintiff's next purchase was not until June 23, 2009—the day after PCBC announced that it had suspended paying dividends. By then it did not matter whether Sandler O'Neill considered the risk of a dividend suspension in making its Buy recommendation or not. The dividend suspension had already happened and was publicly disclosed. According to Plaintiff's own fraud-on-the-market theory, that fact was incorporated into the price of the shares that Shotke purchased. The facts as pled by Plaintiff are directly inconsistent with loss causation. *C.f. In re Apple Securities Litigation,* 886 F.2d 1109, 1116 (9th Cir. 1989) (disclosure of truth to the market through

other channels negates management failure to disclose material facts).

## IV.   **CONCLUSION**

Sandler O'Neill made a Buy recommendation on a stock that went down instead of up, then got caught by surprise when additional bad news was announced.  Plaintiff tries to stretch this into fraud, but cannot do so.  Plaintiff cannot plead that Sandler O'Neill made the Buy without believing in it, that the Buy moved the stock price, that the Buy somehow embodied specific information about loan loss reserves later negated by the second quarter results, or that Sandler O'Neill had any advance notice regarding the negative second quarter results.

Instead, Plaintiff has pleaded at most a negligence case, *i.e.*, that the analyst acted carelessly in issuing the Buy without considering one specific factor: a two year net income rule purportedly controlling the bank's ability to pay dividends.  Plaintiff has not even pled that full consideration of this factor, or the announcement of the dividend suspension itself, would necessarily have disqualified PCBC from receiving a Buy recommendation.  Indeed, Shotke himself purchased shares after the suspension.

Under controlling Ninth Circuit and Supreme Court precedents Plaintiff has failed to plead securities fraud.  The Complaint should be dismissed.


DATED:  December 18, 2009             Respectfully submitted,

                                      NIXON PEABODY LLP


                                      By:   /s/ Karl. D. Belgum
                                            Attorneys for Defendant
                                            SANDLER O'NEILL & PARTNERS L.P.