1  Patrice L. Bishop (182256)
   Timothy J. Burke (181866)
2  service@ssbla.com
   STULL, STULL & BRODY
3  10940 Wilshire Boulevard, Suite 2300
   Los Angeles, CA  90024
4  Tel:   (310) 209-2468
   Fax:   (310) 209-2087
5
   Mark Levine (Admitted *pro hac vice*)
6  mlevine@ssbny.com
   STULL, STULL & BRODY
7  6 East 45th Street
   New York,  NY 10017
8  Tel:   (212) 687-7230
   Fax:   (212) 490-2022
9
   Lionel Z. Glancy (134180)
10 Michael Goldberg(188669)
   info@glancylaw.com
11 GLANCY BINKOW & GOLDBERG LLP
   1801 Avenue of the Stars, Suite 311
12 Los Angeles, CA  90067
   Tel:   (310) 201-9150
13 Fax:   (310) 201-9160

14 **Co-Lead Counsel for Lead Plaintiffs**

15

16                    **UNITED STATES DISTRICT COURT**

17                    **CENTRAL DISTRICT OF CALIFORNIA**

18                          **WESTERN DIVISION**

19

| | |
|---|---|
| 20  In re PACIFIC CAPITAL BANCORP SECURITIES LITIGATION, | CASE NO. CV09-06501 RGK (PLAx) |
| 21     This Document Relates Only To: | **<u>CLASS ACTION</u>** |
| 22     Shotke v. Pacific Capital Bancorp, Case No. 09-CV-7400 | **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS PACIFIC CAPITAL BANCORP, GEORGE LEIS AND DAVID PORTER'S MOTION TO DISMISS** |
| 24 | |
| 25 | DATE:    February 1, 2010 |
| 26 | TIME:    9:00 a.m. |
| 27 | JUDGE:  Hon. R. Gary Klausner |
| | CTRM:  850, Roybal |

28

1

## <u>TABLE OF CONTENTS</u>

2

<u>PAGE NO.</u>

3  Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

4  I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5  II.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

6  III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

7        A.    Standards under Rule 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

8        B.    The Complaint Adequately Pleads Materially False Statements
               Were Made With Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
9
         C.    Plaintiff Adequately Pleads Loss Causation . . . . . . . . . . . . . . . . . . . . . 13
10
         D.    Defendants' Statements are not Protected by the Safe Harbor . . . . . . . 17
11
         E.    The Complaint States A Section 20(a) Claim . . . . . . . . . . . . . . . . . . . . 19
12
13  IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

1

# <u>TABLE OF AUTHORITIES</u>

2

3

**PAGE NO.**

## FEDERAL CASES

4

*In re 2007 Novastar Fin., Inc. Sec. Litig.*,
2008 U.S. Dist. LEXIS 44166 (W.D. Mo. June 4, 2008) . . . . . . . . . . . . . . . . . . . 13

5

*In re Apple Computer sec. Litig.*,
6    886 F.2d 1109 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

7    *Atlas v. Accredited Home Lenders Holding Co.*,
556 F. Supp. 2d 1142 (S.D. Ca. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

8

*Bourjaily v. United States*,
9    483 U.S. 171 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

10    *In re Bradley Pharms. Sec. Litig.*,
421 F. Supp. 2d 822 (D. N.J. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

11

*Cooper v. Pickett*,
12    137 F.3d 616 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

13    *In re Countrywide Fin. Corp. Deriv. Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

14

*DSAM Global Value Fund v. Altris Software, Inc.*,
15    288 F.3d 385 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

16    *In re Daou Sys. Inc. Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 15, 16

17

*Desaigoudar v. Meyercord*,
18    223 F.3d 1020 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

19    *Dura Pharmacueticals, Inc. v. Broudo*,
544 U.S. 336 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 16, 17

20

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
21    316 F.3d 1048 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

22    *In re FVC.com Sec. Litig*,
136 F. Supp. 2d 1031 (N.D. Cal. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

23

*Freeland v. Iridium World Commc'n*,
24    233 F.R.D. 40 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

25    *In re Gilead Sciences Securities Litigation*,
536 F.3d 1049 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

26

*In re GlenFed, Inc. Sec. Litig.*,
27    42 F.3d 1541 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

28

ii

1

# TABLE OF AUTHORITIES

2

PAGE NO.

3

## FEDERAL CASES

4

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

5

*Hoxworth v. Blinder, Robinson & Co.*,
903 F.2d 186 (3d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

6

7

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

8

*Lerch v. Citizens First Bancorp., Inc.*,
805 F. Supp. 1142 (D.N.J. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

9

10

*Lewis v. Straka*,
2008 WL 590863 (E.D. Wis. Mar. 3, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

11

*Miller v. Thane Int'l, Inc.*,
508 F.3d 910 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

12

13

*New York Teacher's Ret. Sys. v. Fremont Gen. Corp.*,
2009 U.S. Dist. LEXIS 94241 (C.D. Cal. Sept. 25, 2009) . . . . . . . . . . . . . . . . . . 12

14

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

15

16

*Nursing Home Pension Fund, Local 144 UCFW v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

17

18

*Plumbers & Pipefitters Local 57 Pension Fund. Cisco Systems, Inc.*,
411 F. Supp. 2d 1172 (N.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 16

19

*In re Reliance Securities Litigation*,
135 F. Supp. 2d 480 (D. Del. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

20

21

*Robbins v. Hometown Buffet*,
1995 U.S. Dist. LEXIS 17870 (S.D. Cal. Mar. 15, 1995) . . . . . . . . . . . . . . . . . . . 13

22

*In re Seitel Inc. Sec. Litig.*,
447 F. Supp. 2d 693 (S.D. Tex. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

23

24

*Shapiro v. UJB Fin. Corp.*,
964 F.2d 272 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

25

*In re Silicon Graphics Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

26

27

*Steiner v. MedQuist, Inc.*,
2006 WL 2827740 (D.N.J. Sept. 29, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

28

iii

# TABLE OF AUTHORITIES

**PAGE NO.**

## FEDERAL CASES

*In re The PMI Group, Inc. Securities Litigation*,
2009 U.S. Dist. LEXIS 101582 (N.D. Cal. Nov. 2, 2009) . . . . . . . . . . . . . . . . . .  18

*Tripp v. IndyMacFin. Inc.*,
2007 U.S. Dist. LEXIS 95445 (C.D. Cal. Nov. 29, 2007) . . . . . . . . . . . . . . . .  10, 12

*Virginia Bankshares, Inc. v. Sandberg*,
501 U.S. 1083 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*In re Wells Fargo Sec. Litig.*,
12 F.3d 922 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11, 12

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

## FEDERAL STATUTES

15 U.S.C. § 78j(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

15 U.S.C. § 78u-4(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

15 U.S.C. § 78u-4(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Fed. R. Civ. P. 8(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Fed. R. Civ. P. 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

iv

1    Plaintiff Thomas Shotke individually and on behalf of all others similarly

2    situated, respectfully submits his Memorandum of Points and Authorities in

3    Opposition to Pacific Capital Bancorp ("PCB" or the "Company"), George Leis, and

4    David Porter's (collectively, the "PCB Defendants") Motion to Dismiss.[1]  Plaintiff

5    respectfully requests that this Court deny PCB Defendants' Motion in its entirety.

6    **I.    INTRODUCTION**

7    This is a class action alleging violations of §§ 10(b) and 20(a) of the Securities

8    Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t(a), and Rule

9    10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, brought on behalf of a Class

10   of all purchasers of PCB common stock between April 30, 2009 and July 30, 2009,

11   inclusive (the "Class Period").  Defendant PCB, based in Santa Barbara, California, is

12   a bank holding company.  ¶9.[2]  PCB is the parent company of Pacific Capital Bank,

13   N.A., a nationally chartered bank that operates 46 branches under the local brand

14   names of Santa Barbara Bank & Trust, First National Bank of Central California,

15   South Valley National Bank, San Benito Bank and First Bank of San Luis Obispo. ¶9.

16   Plaintiff alleges that during the Class Period the PCB Defendants repeatedly

17   issued materially false and misleading statements regarding, *inter alia*, the

18   Company's allowance for loan losses and ability to absorb future losses while they

19   knew or recklessly failed to know that the loan loss provision taken in the first quarter

20   of 2009 was wholly inadequate to meet the Company's exposure to asset

21   deterioration losses.  *See, e.g.*, ¶2.  As a result of Defendants' materially false and

22   misleading statements, Plaintiff and the Class purchased shares of PCB common

23   stock at artificially inflated prices and thereby suffered damages.

24   _____

25   [1]  Plaintiff hereby incorporates his  Opposition to Sandler O'Neill & Partners

26   L.P.'s ("Sandler O'Neill") Motion to Dismiss and the Oppositions filed on November
     18, 2009 by plaintiff William Jurkowitz.  *See* Docket Nos. 45-46.

27
     [2]  All "¶__" mean and refer to the Complaint filed in *Thomas Shotke, et al. v.*
28   *Pacific Capital Bancorp, et al.*, C.D. Cal. Case No. 09-CV-7400.

1

## II.    STATEMENT OF FACTS

On the first day of the Class Period, April 30, 2009, PCB filed its Form 8-K with the Securities and Exchange Commission ("SEC") which attached the Company's  press release announcing financial results for the quarter ended March 31, 2009. ¶24.  In that press release the Company reported that "[f]inancial results for the first quarter 2009 include a provision for loan losses in the Core Bank of $73.5 million. . . [which] increases the Company's allowance for loan losses in the Core Bank to $141.0 million, or 2.48% of total loans, at March 31, 2009."  ¶26.  Defendant Leis also reassured investors as to the adequacy of loan loss allowances:  "We continue to maintain a strong allowance for loan losses, which we believe will enable us to absorb losses in the portfolio as the recession continues."  ¶27.

The Company's April 30, 2009 press release attempted to reassure investors that even in light of a significant decrease in the value of its loan portfolio, which had dropped from $274 million at March 31, 2008 to $198 million at March 31, 2009, the Company was taking certain steps with respect to its "Asset Quality" in order to address loan risk and exposure.  The Company stated that it had "taken several measures to mitigate the risk going forward" which included "the addition of seven full-time positions to Credit Administration as asset managers dealing with problem loans;  a reduction in hold limits on all loan types to reduce size concentrations;  a reduction in total commercial real estate concentration limits to below 300% of capital;  restricting residential construction underwriting to the Company Real Estate Industries Group; disallowing any construction lending outside of the Company's footprint;  and establishing a Board of Directors-level loan committee to oversee concentrations and problem loan resolution, among other responsibilities."  ¶28.

Also on April 30, 2009, the Company conducted a conference call with analysts in order to reiterate many of the reassuring false statements contained in the Company's April 30, 2009 Form 8-K and press release, with respect to the present state of the Company's loan portfolio.  For example, during the April 30, 2009

2

1  analyst conference call defendant Leis stated that "[t]he deterioration occurred in

2  loans that were already in the non-performing category entering the quarter.  [And

3  that], [w]e did not see any meaningful new inflows of residential construction loans

4  into non-performing this quarter."  ¶29.

5      Defendant Leis further stated during the April 30, 2009 conference call with

6  analysts that "[t]he provision we recorded this quarter has kept our core bank

7  allowance for loan losses at a very high level.  At March 31, 2009 our allowance

8  represented 2.48% of total loan [sic] [and] approximately 90% of our allowance is

9  allocated to loans that are not currently impaired which we believe positions us well

10  to observe [sic] the inherent losses in the portfolio."  ¶30.

11      Defendant Porter also reassured analysts with respect to PCB's residential

12  home builder portfolio during the conference call.  In response to a question by

13  Defendant Leis, Defendant Porter responded that "…obviously with what's happened

14  there with the industry, we have looked at that very closely with the regulators, with

15  our home loan review and the marks we have taken now are very current marks and

16  hopefully going forward we won't see the same deterioration particularly after you

17  have had a significant write down on some of these assets."  ¶31.

18      In response to analyst questions during the April 30, 2009 conference call

19  concerning commercial real estate delinquency data, Defendant Leis once again was

20  quite positive in stating that "Actually it looks like our delinquency and then looking

21  at construction it's actually come down a little bit from fourth quarter.  And then on

22  our non-performing loans on construction that's also come down if you look at the

23  table on page 15."  ¶33.  He further stated that "You question around the commercial

24  real estate delinquency, we are watching that very closely obviously, but we have not

25  seen the delinquency metrics really be too negative at this point.  I think it's been

26  relatively manageable. *Id.*

27      On May 11, 2009, the Company filed its Form 10-Q for the quarter ended

28  March 31, 2009, and continued to make reassuring material false statements

3

1  concerning the adequacy of PCB's loan loss reserves.  The Company stated, with

2  respect to its opinion of the loan loss provision, that "Management believes that the

3  continued increase in [allowance for loan losses] will better position the Company to

4  manage anticipated loan losses throughout the forecasted prolonged economic

5  downturn impacting all of the Company's loan portfolios."  ¶35.[3]

6      On June 22, 2009, PCB announced that it deferred regularly scheduled interest

7  payments on its outstanding $69.4 million of junior subordinated notes relating to its

8  trust preferred securities, and that it had likewise suspended the payment of dividends

9  on its common and preferred stock.  ¶40.  Defendant Leis stated that "[w]e believe the

10 actions we have announced today are the most prudent course of action and will

11 improve our flexibility to consider other actions that may need to be taken in order to

12 achieve our targeted capital ratios."  ¶37.[4]  As a result of this announcement, the

13 Company's stock price declined, falling from a closing price of $3.31 per share on

14 June 22, 2009, to a closing price of $2.65 per share on June 23, 2009 and continued to

15 decline, to close at $2.26 per share on Friday June 26, 2009.  ¶41.

16      On July 30, 2009, the Company filed a Form 8-K and press release for the

17 quarter ended June 30, 2009, and announced that PCB experienced a second quarter

18 2009 net loss of $362.6 million, or ($7.77) per share, compared to a net loss of $5.9

19 million, or ($0.13) per common share, in the second quarter of 2008.  ¶46.  The

20 Company disclosed it recorded a provision for loan losses of $194.1 million for the

21 second quarter 2009, which, according to the disclosure, "increase[d] the Company's

22 ───────────────────

23      [3]  The chart included in PCB's Motion to Dismiss and arguments made
24 immediately thereafter (*see* PCB MTD at 1:13-2:27) should not result in the dismissal
   of this action because, *inter alia*,  recently appointed lead plaintiffs the Pagano
25 Family only made one Class Period purchase, on May 21, 2009, and no sales.

26      [4]  In November 2008,  PCB received Troubled Asset Recovery Program, or
27 TARP, funds from the U.S. Treasury, and PCBC's June 22, 2009 dividend
   suspension also applied to the government.  ¶38.  As of October 2009, PCB has "not
28 been able to make [its] scheduled [TARP] payments."  ¶39.

4

allowance for loan losses in the Core Bank by $117 million," and that "[a]t June 30, 2009, the allowance was $258.0 million, or 4.57% of total loans and 80% of non-performing loans." The Company also disclosed a "$128.7 million non-cash charge to reflect an impairment of goodwill." ¶47.

Despite the Company's previous reassurances on April 30, 2009, to the public and analysts that its residential, commercial and industrial loan portfolios were stable and the loan loss reserves for these portfolios was more than adequate, the Company stated, in its July 30, 2009 Form 8-K and press release that the loss consisted of "$77.1 million to cover net charge-offs in the Core Bank, of which approximately $30.1 million related to the residential construction portfolio and $27.0 million related to the commercial and industrial portfolio; and $117.0 million added to the allowance for loan losses in the Core Bank to reflect an increase in problem loans and higher loss rates in recent quarters." ¶48.

The Company's July 30, 2009 Form 8-K and press release provided the following additional disclosures concerning the $194.1 million loan loss provision:

> Total non-performing assets were $348.3 million at June 30, 2009, compared to $271.1 million at March 31, 2009. The increase in non-performing assets is primarily attributable to deterioration in the commercial real estate and construction portfolios.

> Approximately 27% of the Bank's total non-performing assets at June 30, 2009 were still current on interest and principal payments. These credits have been placed on non-performing status due to identification of some form of impairment, such as a decline in collateral value. In such cases, the Bank has established a specific allowance against these impairments. If these borrowers continue to demonstrate the ability to service their debt according to the agreed upon terms, the loans could be moved back to performing status in future quarters. [¶49.]

5

The Company's allowance for loan losses increased from 2.48% of total loans and 54% of total non-performing loans at March 30, 2009 to 4.57% of total loans and 80% total non-performing loans at June 30, 2009.  ¶¶50,51.

During the Company's July 30, 2009 second quarter earnings conference call with analysts, Defendant Leis indicated that the Company was faced with the same issues that it had been facing for some time and made the following statements, among others:

> The drivers of our elevated credit costs continue to be the same issues that we have discussed in previous quarters.  Approximately 39% of the net charge-offs in the second quarter occurred within our residential construction portfolio of [sic] the value of the collateral underlying these loans continue to decline.

> Another 35% of the net charge-offs came from CNI loans, including some businesses that are related to the residential construction industry.  A large provision we recorded this quarter is partially attributable to a change in the methodology that we use to calculate our general reserve for the FAB [sic] five component of the allowance for loan losses.

> In recognition of the dramatic change in the economic conditions that has taken place over the past 2 years, we significantly shortened the time frame that is utilized for estimating historical loss rates from the 7 year period that we have typically used.  The shortened time frame had the effect of giving more weight to recent quarters in which loss rates have been higher.

> As a result we added approximately $88 million more to the general reserve this quarter then [sic] we would have under the more elongated time frame.  This is a more conservative methodology that we believe is appropriate in the current economic environment.  [¶54.]

6

1   While Defendants had previously indicated that the Company's loan loss

2   reserves were "at a very high level" and that the Company "maintained a strong

3   allowance for loan loss reserves" which will enable the Company to "absorb losses in

4   the portfolio as the recession continues," the July 30 announcement revealed to

5   investors that the Company had not adequately reserved for loan losses and, in fact,

6   had not even applied a conservative methodology by which to do so. ¶¶27, 30, 54.

7   In reaction to the Company's July 30, 2009 disclosures, the price of the

8   Company's common stock fell, from closing at $2.6 on July 29, 2009, to $2.26 on

9   July 30, 2009, to $2.12 on July 31, 2009, representing a decline of approximately

10  19.5%.  At the start of the Class Period, on April 30, 2009, the price of the

11  Company's common stock closed at $6.94 per share, representing a Class Period

12  decline in value of 67.44%.  ¶56.

13  **III.    ARGUMENT**

14      **A.    Standards under Rule 9(b)**

15  To state a claim for securities fraud under Section 10(b) of the 1934 Act and

16  SEC Rule 10b-5, a complaint must meet two requirements.  First, it must conform

17  with the "particularity" requirements of Rule 9(b) of the Federal Rules of Civil

18  Procedure.  *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1545 (9th Cir. 1994).  Rule

19  9(b) provides that "in all averments of fraud or mistake, the circumstances

20  constituting fraud or mistake, *i.e.*, the who, what, when, where and how of the alleged

21  fraud, shall be stated with particularity.  Malice, intent, knowledge, and other

22  condition of mind, *i.e.*, the defendants' scienter, may be averred generally."

23  Second, a complaint must meet the pleading requirements provided in the

24  PSLRA.  The PSLRA codifies the "particularity" obligations of Rule 9(b) by

25  requiring that the complaint specify "each statement alleged to have been

26  misleading," and by requiring that the complaint specify the reason or reasons why

27  the statement was false or misleading. 15 U.S.C. § 78u-4(b)(1).  "[I]f an allegation

28  regarding the statement or omission is made on information and belief, the complaint

7

1    shall state with particularity all facts on which that belief is formed." *Id*.  Moreover,

2    the PSLRA provides that a complaint must "state with particularity facts giving rise

3    to a strong inference that the defendant acted with the required state of mind," or

4    scienter.  *Id*. at (b)(2).  The required state of mind is either that the defendant acted

5    intentionally or with "deliberate recklessness."  *In re Daou Sys. Inc. Sec. Litig.*, 411

6    F.3d 1006, 1014-15 (9th Cir. 2005).  "Recklessness only satisfies scienter under

7    § 10(b) to the extent that it reflects some degree of intentional or conscious

8    misconduct." *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999);

9    *see also DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th

10   Cir. 2002) (stating that in order to allege a strong inference of deliberate recklessness,

11   a plaintiff must state "facts that come closer to demonstrating intent, as opposed to

12   mere motive and opportunity" (citations omitted).  Therefore, a plaintiff must "plead,

13   at a minimum, particular facts giving rise to a strong inference of deliberate or

14   conscious recklessness." *In re Silicon Graphics*, 183 F.3d at 979 (emphasis added).

15   A reasonable inference is not enough.  *Id.* at 974.

16       Finally, contrary to Defendants' attempt here to atomize discrete portions of the

17   Complaint, a complaint is to be analyzed in its entirety, as "individual pieces of

18   evidence, insufficient in themselves to prove a point, may in cumulation prove it."

19   *Bourjaily v. United States*, 483 U.S. 171, 179-80 (1987); *Daou*, 411 F.3d at 1022

20   [court considers "whether the total of plaintiffs' allegations, even though individually

21   lacking, are sufficient to create a strong inference that defendants acted with

22   deliberate or conscious recklessness," quoting *Nursing Home Pension Fund, Local

23   144 UCFW v. Oracle Corp.*, 380 F.3d 1226, (9th Cir. 2004)].

24       **B.    The Complaint Adequately Pleads Materially False Statements**

25            **Were Made With Scienter**

26       Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a

27   complaint sufficiently alleges false or misleading statements by "specify[ing] each

28   statement alleged to have been misleading" and "the reason or reasons why the

8

1   statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B).  Accordingly, a complaint

2   sufficiently pleads falsity where it includes the statements or omissions alleged to be

3   misleading, the reasons why each was misleading, and the facts upon which that

4   belief is formed.  *See Desaigoudar v. Meyercord*, 223 F.3d 1020, 1023 (9th Cir.

5   2000).  The Ninth Circuit "recognize[s] that statements literally true on their face may

6   nonetheless be misleading when considered in context."  *Miller v. Thane Int'l, Inc.*,

7   508 F.3d 910, 916 (9th Cir. 2007).  Here, contrary to the defendants' argument, the

8   Complaint identifies Defendants' false and misleading statements, when they were

9   made, and pleads particularized facts supporting the allegations.  ¶¶ 26-35, 60-67.

10   Defendants underestimated their allowance for loan loss reserves for first

11   quarter 2009, while assuring investors that the allowance for loan loss reserves was

12   very conservative and adequate.   Defendants' statements during the Class Period

13   concerning the Company's adequacy of loan loss reserves were materially false and

14   misleading.  ¶¶26-35.  The Complaint specifically alleges materially false and

15   misleading statements contained in the Company's press releases, Form 8-Ks, Form

16   10-Q and conference calls.  The Complaint sets forth the dates of these alleged

17   misstatements, the exact language contained in the materially false and misleading

18   statements as well as the defendant responsible for the statement.  In addition, the

19   Complaint specifically alleges why each of these statements are false and misleading.

20   ¶¶ 60-67.  At this stage of the litigation, nothing more is needed to withstand

21   Defendants' motion to dismiss.  *Desaigoudar,* 223 F.3d at 1023.

22   The PCB Defendants wrongly take issue with many of the allegations in the

23   Complaint.  For example, Defendants claim that ¶60 of the Complaint, which alleges

24   that the statements contained in ¶¶26-35 were false and misleading because "reserves

25   were not conservatively determined," is "not a factual allegation."  Def. Mem. at 9-

26   10.  However, during the Company's July 30, 2009 second quarter earnings

27   conference call with analysts, defendant Leis indicated that its increase in loan loss

28   reserves for the second quarter, was "a more conservative methodology" which

9

1  clearly indicates that the Company's previous methodology was not as conservative.

2  ¶54. In addition, Plaintiff's allegations in ¶¶28 and 62 do not allege that the PCB

3  Defendants "had not taken steps to" mitigate PCB's risk, as set forth in the

4  Company's April 30, 2009 press release, but that the statement contained in this press

5  release was materially false and misleading because these steps "were not sufficient"

6  to "mitigate the risk going forward." ¶62. The Complaint does not assert that

7  defendant Leis' statement during the April 30, 2009 analyst conference call that

8  "[t]he provision we recorded this quarter has kept our core bank allowance for loan

9  losses at a very high level…" (¶30) was materially false and misleading "merely

10 because a subsequent reserve was recorded…" ( Def. Mem. at 11) but, was false and

11 misleading since defendants admitted on July 30, 2009, that this first quarter reserve

12 was in fact not very high because it was not until the end of the second quarter that

13 the Company changed to a method the Company considered conservative.

14        Plaintiff's Complaint is not based on the theory that defendants are liable

15 simply because they increased reserves as the defendants would like this Court to

16 believe. Defendants made numerous statements during the Class Period attesting to

17 the adequacy of the loan loss reserves which they knew at the time to be materially

18 false and misleading. As alleged by Plaintiff, during this short three month Class

19 Period, the "sheer magnitude of the second quarter loan loss provision demonstrates

20 scienter on the part of the PCBC Defendants. Compared to the additional first quarter

21 provision of $73.5 million (for a total provision of $141 million), the additional

22 second quarter loan loss provision of $117 million (for a total provision of $258

23 million at June 30, 2009), represented more than double the Company's net interest

24 income for the second quarter of 2009." ¶70. *In re FVC.com Sec. Litig*, 136 F. Supp.

25 2d 1031 (N.D. Cal. 2000) and 2007 U.S. Dist. LEXIS 95445 (C.D. Cal. Nov. 29,

26 2007), cited by Defendants, do not negate Plaintiff's allegations. In both *FVC* and

27 *IndyMac*, the plaintiffs asked for an inference of scienter based on selling of insider

28 stock and the courts rejected that inference after finding that the amount of retained

10

1    stock by the defendants was too high for such a finding. In contrast, in this action,

2    Plaintiff makes <u>no</u> claim that the PCB Defendants' scienter is demonstrated by their

3    insider sales. *In re Worlds of Wonder Sec. Litig.*, 35 F. 3d 1407 (9th Cir. 1994), is

4    also not dispositive because it was a ruling on summary judgment decided prior to the

5    passage of the PSLRA, meaning the *WOW* plaintiffs, unlike Plaintiff herein, had an

6    opportunity to take discovery and provide a factually developed record of scienter.

7        Defendants ignore Ninth Circuit precedent with respect to actionable claims

8    related to manipulations of loan loss reserves. In *In re Wells Fargo Sec. Litig.*, 12

9    F.3d 922 (9th Cir. 1993), the Ninth Circuit held that the shareholders were "correct"

10   in pointing out "that the deliberate failure to recognize problem loans, thus

11   understating the reserve, constitutes an actionable omission or misrepresentation of

12   existing fact which cannot be dismissed as a mere matter of internal mismanagement,

13   unsound business practice, or poor accounting judgment." *Wells Fargo*, 12 F.3d at

14   926.[5]

15       Rejecting many of the arguments that Defendants make here, the Ninth Circuit

16   further stated: "There is nothing unique about representations and omissions

17   regarding loan loss reserves that removes them from the purview of the antifraud

18   provisions of the federal securities laws. In our view a reasonable investor would be

19   influenced significantly by knowledge that a bank has knowingly or recklessly hidden

20   its true financial status by deliberately misstating its level of non-performing, loans,

21   failing to provide adequate reserves, and indulging its problem loan customers."

22   *Wells Fargo*, 12 F.3d at 926.

23       As the defendants unsuccessfully attempted in *Wells Fargo*, Defendants here

24   contend that loan loss reserves "are just estimates of the expected performance of the

25   loan pool" and "are always subject to change, particularly during periods of economic

26

27   _____

28       [5] *Superseded by statute on other grounds as recognized in Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1063 (9th Cir. 2000).

11

stress." Def. Mem. at 8. *Wells Fargo* flatly rejected this assertion. *Wells Fargo*, 12 F.3d at 927. More recently, Judge Marilyn Huff of the Southern District of California similarly rejected these same arguments in denying defendants' motions to dismiss a complaint alleging "Defendants manipulated earnings by inadequately reserving for defaults on mortgage loans held by the company for investment." *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1150 (S.D. Ca. 2008); *see also Lewis v. Straka*, 2008 WL 590863 (E.D. Wis. Mar. 3, 2008) (same). In short, there is no exception to the federal securities laws for manipulations of loan loss allowances.

The cases the PCB Defendants rely on do not hold otherwise. This Court in *Tripp v. IndyMacFin. Inc.,* 2007 U.S. Dist. LEXIS 95445 at *9 (C.D. Cal. Nov. 29, 2007) dismissed the complaint, with leave to amend, because the allegations failed to sufficiently allege scienter especially the allegations with respect to confidential witnesses since, the complaint failed to allege that the defendants "shared" the witnesses' "beliefs and opinions" or "that they were aware of them." In addition, this court found that the inference of scienter was "functionally negated" since the defendants "retained a large percentage of their stock". *Id.* at * 12. This court in *New York Teacher's Ret. Sys. v. Fremont Gen. Corp.*, 2009 U.S. Dist. LEXIS 94241 (C.D. Cal. Sept. 25, 2009), dismissed the complaint, without prejudice, because even after having the benefit of guidance from the court as to the pleading deficiencies in the amended complaint, plaintiffs again failed to plead with sufficient specificity in the second amended complaint. *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044 (C.D. Cal. 2008), is distinguishable because the allegation with respect to loan loss reserves in the *Countrywide* complaint was merely an observation by plaintiffs that "the allowances in 2003-2006 were less than half their 2002 levels" and, therefore, inadequate. *Id.* at 1052, 1070. In contrast, Plaintiff's Complaint specifically sets forth allegations of false and misleading statements made by defendants in their public documents and in publicly disseminated conference calls that are reassurances as to the adequacy of the Company's loan loss reserves.

1   Similarly, *In re 2007 Novastar Fin., Inc. Sec. Litig.*, 2008 U.S. Dist. LEXIS 44166, at

2   *12 (W.D. Mo. June 4, 2008), the plaintiff does not allege any specific misstatements

3   with respect to the adequacy of Novastar's reserves, but concludes that the initial

4   provisions were false because they later proved to be inadequate.

5          In addition to Defendants' argument that the Complaint fails to adequately

6   allege false statements, the Defendants contend that their statements concerning the

7   Company's finances and loan loss reserves were "statements of optimism" and not

8   actionable under the securities laws. Def. Mem. at 12-13. This is not so.  As a lending

9   company, the quality of its loans and the sufficiency of its loan loss reserves are *not*

10  immaterial as a matter of law as reasonable investors would rely upon such

11  statements.[6]  Indeed, the Ninth Circuit holds that statements of expectation, belief,

12  and even "general expressions of optimism may be actionable under federal securities

13  laws."[7]  Here, defendants' statements concerning the adequacy of the Company's loan

14  loss reserves-when viewed in context-were material to investors.

15                 **C.    Plaintiff Adequately Pleads Loss Causation**

16         Plaintiff's Complaint contains allegations of a series of disclosures to the

17  market that resulted in the decrease of inflation that was in the stock due to the PCB

18  Defendants issuing materially false and misleading statements.  It alleges that the

19  Plaintiff purchased PCB stock at artificially inflated prices, the price of PCB stock

20

21  ───────────────

22         [6]  *See, e.g., Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200-201 (3d
    Cir. 1990) ("To say that a statement is mere 'puffing' is, in essence, to say that it is

23  immaterial, either because it is so exaggerated ('You cannot lose.') or so vague ('This
    bond is marvelous.') that a reasonable investor would not rely on it."); *Robbins v.*

24  *Hometown Buffet,* 1995 U.S. Dist. LEXIS 17870, at *25 (S.D. Cal. Mar. 15, 1995).

25         [7]  *In re Apple Computer sec. Litig.,* 886 F.2d 1109, 113 (9th Cir. 1989); *see also*

26  *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1093 (1993) ("conclusory

27  terms in a commercial context are reasonable understood to rest on a factual basis that
    justifies them as accurate, the absence of which renders them misleading"); *Cooper v.*

28  *Pickett,* 137 F.3d 616, 620 (9th Cir. 1998) ("business was strong").

13

1   declined from $3.31 per share on June 22, 2009, following a disclosure that the

2   Company was deferring its interest payment on certain debt and was suspending the

3   payment of dividends on its common stock and preferred stock, to a closing price of

4   $2.65 per share on June 23, 2009, and that it continued to fall through the remainder

5   of the week to close at $2.26 per share.  ¶¶40-41, 84, 95.  The Complaint also alleges

6   that in response to disclosure of second quarter 2009 earnings which included the

7   fact, *inter alia*, that PCB recorded an additional $194.1 million loan loss provision,

8   the Company's common stock fell to $2.12 on July 31, 2009, representing a Class

9   Period decline in value of 67.44%.  *See, e.g.*, ¶¶45-51, 54-58.  It also alleges that

10  Plaintiff and other members of the Class held PCB stock as the market began to learn

11  the truth and the inflation began to dissipate.  ¶95.  These revelations clearly relate to

12  previous statements made by the PCB Defendants regarding, among other things, the

13  strength of loan loss allowance, their monitoring of delinquency metrics, addition of

14  personnel to manage mediation of troubled assets and a previous increase in the loan

15  loss allowance to better position the company to manage anticipate loan losses.  ¶¶27-

16  34  These allegations easily satisfy the elements of loss causation under *Dura*

17  *Pharmacueticals, Inc. v. Broudo*, 544 U.S. 336 (2006).

18          All a plaintiff need do under *Dura* is "'provide a defendant with some

19  indication of the loss and the causal connection that the plaintiff has in mind.'"

20  *Plumbers & Pipefitters Local 57 Pension Fund. Cisco Systems, Inc.*, 411 F. Supp. 2d

21  1172, 1175 (N.D. Cal. 2005), quoting *Dura*, 544 U.S. at 347 (emphasis in original).

22  The loss causation requirement is "not meant to impose a great burden upon a

23  plaintiff and simply requires a plaintiff to provide a short and plain statement in

24  accordance with Fed. R. Civ. P. 8(a)(2) setting forth the relevant loss and "what the

25  causal connection might be between" plaintiff's loss and defendants' misconduct.

26  *Dura*, 544 U.S. at 347; *see also In re Gilead Sciences Securities Litigation*, 536 F. 3d

27  1049, 1057 (9th Cir. 2008), *citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007),

28  (There is no exception to the general rule that "as long as the plaintiff alleges facts to

14

1    support a theory that is not factually implausible, the court's skepticism is best

2    reserved for later states of the proceedings when the plaintiff's case can be rejected

3    on evidentiary grounds."). While *Dura* did not specify how the causal link could be

4    satisfied, courts in this Circuit have held that allegations that a stock declined

5    following a disclosure of at least part of the truth is sufficient to allege the necessary

6    causal connection. *See, e.g. In re Daou Systems Inc.,* 411 F. 3d at 1026-27

7    (allegations that a series of partial disclosures revealed company's "true financial

8    health" satisfy *Dura*); *Cisco Systems*, 411 F. Supp. 2d at 1177-78 (stock decline

9    following partial disclosures sufficient to plead loss causation under *Dura*).

10        The PCB Defendants do not seem to dispute that Plaintiff has satisfied the loss

11    causation requirement with respect to the decline in the price of PCB stock that began

12    on June 22, 2009 and continued until June 26, 2009. Their argument disputing loss

13    causation focuses on the drop following the July 30, 2009 disclosure. But the

14    revelations to the market need not take the form of a single, unitary disclosure (*e.g.*

15    disclosure of cut in dividend, suspension of debt repayment), but rather may consist

16    of a series of partial disclosures from a number of sources that cause the truth to make

17    its way into the market. That is precisely the theory of loss causation sustained by the

18    Ninth Circuit in *Daou* and by the Northern District of California in *Cisco Systems*.

19    Numerous recent decisions applying *Dura* are in agreement. *See, e.g. In re Bradley*

20    *Pharms. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D. N.J. 2006) ("We disagree with

21    Defendants' rigid and dogmatic interpretation of *Dura*. . . [T]he revelation of the

22    'truth'. .    did not take the form of a single, unitary, disclosure but occurred through a

23    series of disclosing events'"); *In re Seitel Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 710

24    (S.D. Tex. 2006) ("[t]he Complaint further alleges a series of partial disclosures that

25    caused the trust to begin to 'leak out' and 'make its way into the marketplace' causing

26    the stock price to fall significantly'") (citing *Dura*, 544 U. S. at 342); *Steiner v.*

27    *MedQuist, Inc.*, 2006 WL 2827740 at * 20 (D.N.J. Sept. 29, 2006) (""[T]he

28    [complaint] is replete with allegations that the stock was negatively affected by a

15

1   number of partial disclosures revealing the fraudulent billings scheme.").  As one

2   court noted: "[R]eading *Dura* to require proof of a complete, corrective disclosure

3   would allow wrongdoers to immunize themselves with protracted series of partial

4   disclosures." *Freeland v. Iridium World Commc'n*, 233 F.R.D. 40, 47 (D.D.C. 2006).

5      The PCB Defendants' objection to the July 30, 2009 drop being consistent with

6   loss causation does not revolve around the substance of the disclosure but due to the

7   fact that most of the drop within the Class Period occurred following the first of the

8   series of disclosures.  Def. Mem. at 16.  But because the truth may be revealed in a

9   series of disclosures, the fact of the market drop after the July 30, 2009 disclosure

10   does not go to whether the second disclosure satisfies the loss causation requirement

11   for pleading purposes but rather how much, if any of the drop, will be awarded to

12   Plaintiff at trial.  Nor does the fact that the PCB Defendants were able to cherry pick a

13   subsequent date when the price recovered, for reasons that may be completely

14   unrelated, address the issue of whether the Complaint adequately alleges loss

15   causation.  The appropriateness of any stock recovery (or further decline) are issues

16   that potentially can be brought to the Court's attention when the merits are

17   determined and the Court at that time can decide if any of that information concerning

18   price reaction goes to the jury.  At that time a jury can understand the reason for the

19   stock decline and the reason for the recovery.

20      Plaintiffs are not required to show that a defendant's misrepresentations were

21   the 'sole reason' for the stock's decline in value, other contributing forces will not bar

22   recovery under the loss causation requirement." *Cisco Systems*, 411 F. Supp. 2d at

23   1176, quoting *Daou*, 411 F. 3d at 1025.  If there were also other reasons for the stock

24   decline in June and July, 2009, it is for the jury to decide the amount of the decline, if

25   any, that is attributed to the PCB Defendants.

26      The Complaint "contains the very allegations regarding share price decrease

27   and public exposure to the truth the Supreme Court found lacking in the *Dura*

28   complaint." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1025 (S.D. Cal.

16

1   2005).  The Complaint describes the statements by the PCB Defendants that inflated

2   the market price of PCB stock, and connects those disclosures to the declines in the

3   price of PCB stock.  That is all that is required under *Dura*.  It is not necessary for

4   Plaintiff to show that the information that was disclosed was exactly the same as the

5   information misrepresented to the market.

6           The PCB Defendants also suggest that Plaintiff's Complaint is deficient

7   because it does not plead any facts "showing that the market's response to the July

8   30, 2009 announcement was the reaction to a fraud" rather than just disclosure of the

9   Company's "poor financial health".  Def. Mem. at 17.  The PCB Defendants imply

10  that in order to satisfy the loss causation requirement Plaintiff was required to

11  reference a statement by an analyst that there was as fraud or that the first quarter

12  financial statements were overstated.  Not surprisingly, the PCB Defendants do not

13  provide any authority that Plaintiff is required to plead such facts.  Disregarding the

14  low Rule 8(a) pleading standard for loss causation, PCB Defendants seek this Court

15  to hold Plaintiff to a pleading standard that would only be possible to satisfy an

16  extreme case such as an Enron situation.

17          The issues raised by the PCB Defendants are quintessential fact issues to be

18  decided by the jury.  *See e.g. In re Immune Response*, 375 F. Supp. 2d at 1025

19  ("Whether the alleged omissions and misstatements actually were the cause-in fact of

20  the [decline in ] price of [defendant's] stock raises an issue of fact and, a s such, is a

21  question reserved for a motion for summary judgment or for the trier of fact."); *In re*

22  *Seitel. Inc.*, 447 F. Supp. 2d at 713 ("Defendants' fact-based argument [regarding the

23  reasons for the price decline] disputes the allegations in the Complaint and, therefore,

24  requires a fact-specific inquiry at the summary judgment or trial stage."

25  **D.      Defendants' Statements are not Protected by the Safe Harbor**

26          The PCB Defendants memorandum contains extensive discussion about the

27  statutory "Safe Harbor" which is part of the PSLRA.  Def. Mem. at 17-20.  After

28  spending two pages writing about its supposed "cautionary" statements, the reason

17

for the Safe Harbor and the various prongs which need to be satisfied, the PCB

Defendants fail to step back and ask the most important question.  Are there particular

statements of PCB alleged in the Complaint that are forward looking statements?  If a

statement is not forward looking but a statement of then exiting fact regarding the

company's business, it is not protected as a forward looking statements no matter

how many cautionary statements or risk factors are identified by the PCB Defendants.

*In re The PMI Group, Inc. Securities Litigation*, 2009 U. S. Dist LEXIS 101582 at *

9-11 (N.D. Cal. Nov. 2, 2009) (finding certain statements not protected by statutory

safe harbor because they were statements of then-existing fact).

The PCB Defendants have not met the first test because they have failed to

clearly identify any statements alleged in the complaint to be materially false and

misleading as forward looking statements.  Instead, they make a general statement

that "plaintiffs allege that defendants made false or misleading forward looking

statement regarding the sufficiency of PCB's reserves to absorb future loan losses."

Def. Mem. at  19.  Yet there is no reference to any paragraph in Plaintiff's Complaint,

leaving Plaintiff to guess at what PCB intended.  The only statement in the Complaint

that appears to be anything like that referenced in PCB's memorandum is a quote

from PCB's April 30, 2009 press release which states, "We continue to maintain a

strong allowance for loan losses, which we believe will enable us to absorb losses in

the portfolio as the recession continues." ¶27.  But that is a statement of the current

state of business at PCB because it addresses the strength of the reserve as of that

moment.[8]  After all, a loan loss reserve is a line item in a company's current financial

---

[8]  Statements regarding loan loss reserves are "not projections, but are directed
to the then-present state of [a company's] financial condition. *In re Reliance
Securities Litigation*, 135 F. Supp. 2d 480,504 (D. Del. 2001); *Lerch v. Citizens First
Bancorp., Inc.*, 805 F. Supp. 1142, 1150 (D.N.J. 1992)("The setting of loan loss
reserves, … is intimately related to the bank's analysis of the *state of its existing
loans*, particularly its nonperforming loans.  And the setting of loan loss reserves,
while involving some economic judgment and prediction, may be judged as involving

18

statement and the purpose of a (current) loan loss reserve is to absorb losses that may occur in the future.[9]  If that was considered a forward looking statement, a line item of a current financial statement and an issuer's comments about the adequacy of that statement of the current financial would receive extra protection above and beyond all the other line items of current operations in an issuer's financial statement such as income, expenses, inventory and revenue.  That would lead to insulation of corporate defendants from allegations of fraud in a manner that could not have been intended by Congress.

Accordingly there is no need for the Court to even consider what the PCB Defendants call the "first prong," i.e. whether there is adequate cautionary language, or the "second prong," whether the statements were made with actual knowledge that they were false.  A review of the other statements in the Complaint that Plaintiff alleges to be material false and misleading, although not even referenced by the PCB Defendants in their memorandum provide no indication that any of them were forward looking so that there is no reason for the Court to attempt to apply the two pronged test suggested by the PCB Defendants.

### E.    The Complaint States A Section 20(a) Claim

Under § 20(a), a plaintiff must allege (1) a primary violation of the securities laws and (2) that a defendant exercised actual power or control over the primary violator.  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 945 (9th Cir. 2003).  Defendants contend that

---

either sound or risky business management judgment." (emphasis added).

[9]  A loan loss reserve is "defined in the banking trade as a statement of condition, or balance sheet, account set up by a bank based on its expectations about future loan losses.  As losses occur, they are charged against this reserve.  That is, the loan account is credited and the reserve account is debited.  The reserve is established by a debit to an expense account called the loan loss provision, with a corresponding credit to the loan loss reserve." *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 281 (3d Cir. 1992) (quotation omitted).

19

control person liability under § 20(a) does not exist because no primary violation has been sufficiently alleged. Def. Mem. at 20. However, as shown above, Plaintiff's § 10(b) claims are adequately pled. Indeed, Defendants do not and cannot dispute that Plaintiff has properly alleged the Individual Defendants' control with respect to PCB. The Complaint sufficiently alleges that the Individual Defendants exercised "control" over PCB due to: (1) their high level positions, and (2) their direct involvement in its day-to-day operations, including its financial reporting. ¶¶100, 101. These allegations are sufficient at this stage. *See America West,* 320 F.3d at 945 (control is an "intensely factual question"). Accordingly because the Complaint sufficiently alleges a primary violation of § 10(b) based on the materially false and misleading PCB press releases, conference calls and SEC filings quoted above, Plaintiff's § 20(a) claim also should be sustained against all Defendants.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny the PCB Defendants' Motion to Dismiss in its entirety. If the Court is inclined to grant any part of Defendants' Motion to Dismiss, Plaintiff respectfully requests leave to amend. *See* Fed. R. Civ. P. 15 (Leave to amend should be "freely give[n] when justice so requires."); *Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("In this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error").

**STULL, STULL & BRODY**

Dated: January 15, 2009        By:    s/Patrice L. Bishop
                                     Patrice L. Bishop
                                     10940 Wilshire Boulevard
                                     Suite 2300
                                     Los Angeles, CA 90024
                                     Tel:   (310) 209-2468
                                     Fax:  (310) 209-2087

20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mark Levine
STULL, STULL & BRODY
6 East 45th Street
New York, NY 10017
Tel:   (212) 687-7230
Fax:   (212) 490-2022

Lionel Z. Glancy
Michael Goldberg
**GLANCY BINKOW & GOLDBERG LLP**
1801 Avenue of the Stars
Suite 311
Los Angeles, CA 90067
Tel:   (310) 201-9150
Fax:   (310) 201-9160

**Co-Lead Counsel for Lead Plaintiffs and the Purported Class**

Z:\STULL\PACIFIC CAPITAL\PLD\Opp MTD Shotke by PCB.wpd