Patrice L. Bishop (182256)
Timothy J. Burke (181866)
service@ssbla.com
STULL, STULL & BRODY
10940 Wilshire Boulevard, Suite 2300
Los Angeles, CA 90024
Tel:   (310) 209-2468
Fax:   (310) 209-2087

Mark Levine (Admitted *pro hac vice*)
mlevine@ssbny.com
STULL, STULL & BRODY
6 East 45th Street
New York, NY 10017
Tel:   (212) 687-7230
Fax:   (212) 490-2022

Lionel Z. Glancy (134180)
Michael Goldberg(188669)
info@glancylaw.com
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Tel:   (310) 201-9150
Fax:   (310) 201-9160

**Co-Lead Counsel for Lead Plaintiffs**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| In re PACIFIC CAPITAL BANCORP SECURITIES LITIGATION,<br><br>This Document Relates Only To:<br><br>Shotke v. Pacific Capital Bancorp, Case No. 09-CV-7400<br>_____ | CASE NO. CV09-06501 RGK (PLAx)<br><br>**CLASS ACTION**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SANDLER O'NEILL PARTNERS L.P.'S MOTION TO DISMISS**<br><br>DATE:      February 1, 2010<br>TIME:      9:00 a.m.<br>JUDGE:    Hon. R. Gary Klausner<br>CTRM:     850, Roybal |

1

# TABLE OF CONTENTS

2
PAGE NO.

3  Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

4  I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5  II.   PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

6  III.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

7  IV.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

8        A.   Reviewing and Pleading Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

9        B.   The Complaint Pleads Actionable False and Misleading Statements  . . 7

10            1.   Defendants' "Buy" Recommendation Was Made Without a
                   Reasonable Basis  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
11
              2.   Plaintiff Has Adequately Pled the Failure to
12                 Downgrade the Stock Was An Actionable False Statement  . . . 11

13       C.   The Complaint Adequately Alleges that Defendants' Acted With
              Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
14
         D.   Plaintiff Adequately Pleads Loss Causation . . . . . . . . . . . . . . . . . . . . . 15
15
         E.   If Necessary, Leave to Amend is Appropriate  . . . . . . . . . . . . . . . . . . . 18
16
17  V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18

19

20

21

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**PAGE NO.**

## FEDERAL CASES

*In re 2TheMart.com Sec. Litig.*,
114 F. Supp. 2d 955 (C.D. Cal. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*In re Apple Computer Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Blackie v. Barrack*,
524 F.2d 891 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Bradley Pharms. Sec. Litig.*,
421 F. Supp. 2d 822 (D.N.J. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Broudo v. Dura Pharmaceuticals, Inc.*,
339 F.3d 933 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17, 18, 19

*Brown v. Credit Suisse First Boston Corp. (Agilent Technologies, Inc.)
Analyst Reports Sec. Litig.*,
431 F.3d 36 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Credit Suisse First Boston (Agilent Tech., Inc.) Analyst Reports Sec. Litig.*,
2005 U.S. Dist. LEXIS 6345 (D. Mass. Mar. 31, 2005) . . . . . . . . . . . . . . . . . . . 10

*In re Daou Sys. Inc. Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*Demarco v. Lehman Bros., Inc.*,
309 F. Supp. 2d 631 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*In re Elec. Data Sys. Corp. Secs.*,
2004 U.S. Dist. LEXIS 289 (E.D. Tex. Jan. 13, 2004) . . . . . . . . . . . . . . . . . . . . 11

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Fogarazzo v. Lehman Bros., Inc.*,
341 F. Supp. 2d 274 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Foman v. Davis*,
371 U.S. 178 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Foxhollow Technologies, Inc., Sec. Litig.*,
2008 U.S. Dist. LEXIS 52363 (N.D. Ca. May 27, 2008),
*quoting In re Verity, Inc. Sec. Litig.*,
2000 U.S. Dist. LEXIS 11720 (N.D. Cal. Aug. 11, 2000) . . . . . . . . . . . . . . . . . . 12

ii

1

## TABLE OF AUTHORITIES

2

PAGE NO.

3

### FEDERAL CASES

4

*Freeland v. Iridium World Communications*,
233 F.R.D. 40 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

5

6

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

7

*In re InterMune, Inc. Sec. Litig.*,
2004 U.S. Dist. LEXIS 15382 (N.D. Cal. July 30, 2004) . . . . . . . . . . . . . . . . . 8

8

9

*In re Juniper Networks, Inc. Sec. Litig.*,
542 F. Supp. 2d 1037 (N.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

10

*Kaplan v. Rose*,
49 F.3d 1363 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

11

12

*Lopez v. Smith*,
203 F.3d 1122 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

13

*In re NovaGold Res. Inc. Secs. Litig.*,
629 F. Supp. 2d 272 (S.D.N.Y. 2009),
*quoting Lattanzio v. Deloitte & Touche LLP*,
476 F.3d 147 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

14

15

16

*Nursing Home Pension Fund v. Oracle Corp.*,
242 F. Supp. 2d 671 (N.D. Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

17

*Overton v. Todman & Co.*,
478 F.3d 479 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18

19

*Plumbers & Pipefitters Local 57 Pension Fund. Cisco Systems, Inc.*,
411 F. Supp. 2d 1172 (N.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 18

20

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

21

22

*Salomon Analyst Level 3 Litig.*,
350 F. Supp. 2d 477 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

23

*In re Seitel Inc. Sec. Litig.*,
447 F. Supp. 2d 693 (S.D. Tex. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

24

*South Ferry LP, No.2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

25

26

*Steiner v. MedQuist, Inc.*,
2006 WL. 2827740 (D.N.J. Sept. 29, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

27

*Swack v. Credit Suisse First Boston*,
383 F. Supp. 2d 223 (D. Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28

iii

## TABLE OF AUTHORITIES

PAGE NO.

### FEDERAL CASES

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

*In re Textainer P'ship Sec. Litig.*,
2005 U.S. Dist. LEXIS 40974 (N.D. Cal. Dec. 12, 2005) . . . . . . . . . . . . . . . . . . . 13

*United States v. Webb*,
655 F.2d 977 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Usher v. City of Los Angeles*,
828 F.2d 556 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Warsaw v. Xoma Corp.*,
74 F.3d 955 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

### FEDERAL STATUTES

17 C.F.R. § 240.10b-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

15 U.S.C. § 78j(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

15 U.S.C. §78u-4(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Civ. P. 8(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Fed. R. Civ. P. 15(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

1    Plaintiff Thomas Shotke ("Plaintiff"), individually and on behalf of all others

2 similarly situated, respectfully submits his Memorandum of Points and Authorities in

3 Opposition to Sandler O'Neill & Partners L.P.'s ("Sandler O'Neill") Motion to

4 Dismiss.[1]  Plaintiff respectfully requests that this Court deny Sandler O'Neill's

5 Motion in its entirety.

6 ## I.    INTRODUCTION

7    This is a class action alleging violations of §§ 10(b) and 20(a) of the Securities

8 Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t(a), and Rule

9 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, brought on behalf of a Class

10 of all purchasers of PCB common stock between April 30, 2009 and July 30, 2009,

11 inclusive (the "Class Period").  Defendant Sandler O'Neill is a privately-held firm

12 which describes its core practice areas as investment banking, capital markets, fixed

13 income/balance sheet management, equity research, equity trading and sales, and

14 mortgage finance.  During the Class Period, Sandler O'Neill provided analyst

15 coverage and issued analyst reports and ratings relating to PCB.  ¶14.[2]

16    In his Complaint, Plaintiff alleges that during the Class Period Sandler O'Neill,

17 with no basis for changing its rating of PCB common stock, recklessly raised its

18 rating of "Hold" to "Buy," reinforcing PCB's false impression that it was, *inter alia*,

19 adequately reserved for loan losses, despite the fact that the PCB Defendants knew or

20

21    _____

22    [1]  Plaintiff hereby incorporates his Memorandum of Points and Authorities in
Opposition to Pacific Capital Bancorp ("PCB" or the "Company"), George Leis, and
23 David Porter's (collectively, the "PCB Defendants") Motion to Dismiss, and the
Opposition(s) to Motions to Dismiss filed on November 18, 2009, by plaintiff
24 William Jurkowitz.  *See* Docket Nos. 45-46.  The defendants' Motion(s) to Dismiss
Plaintiff's Complaint are both substantially similarly to the fully briefed and pending
25 Motion(s) to Dismiss filed in the Jurkowitz Action.
26

27    [2]  All "¶__" mean and refer to the Complaint filed in *Thomas Shotke, et al. v.*
*Pacific Capital Bancorp, et al.*, C.D. Cal. Case No. 09-CV-7400 (the "Shotke
28 Action").

1

recklessly failed to know that the loan loss provision taken in the first quarter of 2009 was wholly inadequate to meet the Company's exposure to asset deterioration losses. ¶2.  As alleged in the Complaint, at no time herein relevant did Sandler O'Neill conduct the appropriate analyses of the financial condition of a bank to determine that PCB common stock was actually a good investment which warranted a "Buy" rating during the Class Period.  ¶43.  Indeed, if Sandler O'Neill had actually assessed PCB's financial condition, its analyst would have understood that Pacific Capital was not a good investment and that a "Buy" rating was not warranted, a fact acknowledged by the Sandler O'Neill analyst a mere ten days after he upgraded PCB's rating. *Id*.

## II.    PROCEDURAL HISTORY

On September 8, 2009, plaintiff Jurkowitz filed the first related Complaint in this now consolidated action.  Pursuant to 15 U.S.C. §78u-4(a)(3)(A), on September 9, 2009, plaintiff Jurkowitz published a notice of pendency of action informing other members of the purported Class that they, if so desired, have sixty (60) days to move the Court for the appointment of lead plaintiff(s) and lead counsel.  Plaintiff Shotke filed the related Shotke Action on October 13, 2009.

Two competing motions for the appointment of lead plaintiff(s) and lead counsel were filed with this Court on November 9, 2009.  On December 7, 2009, pursuant to the stipulation of the competing lead plaintiff applicants, the Peter Pagano & Marjorie Pagano Revocable Trust and Peter Alex Pagano (collectively, the "Pagano Family") and Johnny Rios, this Court entered an Order consolidating the two related actions.  On January 7, 2009, pursuant to the stipulation of the parties, this Court entered a further Order appointing the Pagano Family and Johnny Rios as co-lead plaintiffs, and appointing their counsel as co-lead counsel for lead plaintiffs and the Class.

///

///

///

2

## III.   STATEMENT OF FACTS

Defendant PCB, based in Santa Barbara, California, is a bank holding company.  ¶9. PCB is the parent company of Pacific Capital Bank, N.A., a nationally chartered bank that operates 46 branches under the local brand names of Santa Barbara Bank & Trust, First National Bank of Central California, South Valley National Bank, San Benito Bank and First Bank of San Luis Obispo.  ¶9.  The Class Period begins on April 30, 2009, with the PCB Defendants, in a Form 8-K filed by the Company with the Securities and Exchange Commission ("SEC"), falsely and misleadingly assuring investors that its loan loss reserves were adequate to absorb any future losses.  ¶24.  In the press release attached to the 8-K, the Company also reported that "[f]inancial results for the first quarter 2009 include a provision for loan losses in the Core Bank of $73.5 million. . . [which] increases the Company's allowance for loan losses in the Core Bank to $141.0 million, or 2.48% of total loans, at March 31, 2009." ¶26.

The Company's April 30, 2009 press release attempted to reassure investors that even in light of a significant decrease in the value of its loan portfolio, which had dropped from $274 million at March 31, 2008 to $198 million at March 31, 2009, the Company was taking certain steps with respect to its "Asset Quality" in order to address loan risk and exposure.  The Company stated that it had "taken several measures to mitigate the risk going forward" which included "the addition of seven full-time positions to Credit Administration as asset managers dealing with problem loans;  a reduction in hold limits on all loan types to reduce size concentrations;  a reduction in total commercial real estate concentration limits to below 300% of capital;  restricting residential construction underwriting to the Company Real Estate Industries Group; disallowing any construction lending outside of the Company's footprint;  and establishing a Board of Directors-level loan committee to oversee concentrations and problem loan resolution, among other responsibilities."  ¶28.  On that same date the Company also conducted a conference call with analysts in order to

3

1    reiterate many of the reassuring materially false statements contained in the

2    Company's April 30, 2009 Form 8-K and press release, with respect to the present

3    state of the Company's loan portfolio.  *See, e.g.*, ¶¶29-31, 33.

4         On May 11, 2009, the Company filed its Form 10-Q for the quarter ended

5    March 31, 2009, and continued to make reassuring materially false statements

6    concerning the adequacy of PCB's loan loss reserves.  The Company stated, with

7    respect to its opinion of the loan loss provision, that "Management believes that the

8    continued increase in [allowance for loan losses] will better position the Company to

9    manage anticipated loan losses throughout the forecasted prolonged economic

10   downturn impacting all of the Company's loan portfolios."  ¶35.

11        On June 17, 2009, as noted *supra*, Defendant Sandler O'Neill raised their

12   rating of PCB stock  from "Hold" to "Buy," reinforcing the impression to the

13   investing public that the Company was adequately reserved for loan losses.  ¶36.

14   Only five days after this upgrade, the Company announced on June 22, 2009 that it

15   deferred regularly scheduled interest payments on its outstanding $69.4 million of

16   junior subordinated notes relating to its trust preferred securities, and that the

17   Company has likewise suspended the payment of dividends on its common and

18   preferred stock.  ¶40.  As a result of this announcement, the Company's stock price

19   declined, falling from a closing price of $3.31 per share on June 22, 2009, to a closing

20   price of $2.65 per share on June 23, 2009 and continued to decline, to close at $2.26

21   per share on Friday June 26, 2009.  ¶41.

22        A news article published on June 27, 2009, by *The Associated Press*, authored

23   by that agency's national business columnist Rachel Beck and headlined "Investors'

24   tools to understand banks," reported on an interview that had been conducted between

25   the Company's management and Aaron James Deer, the Sandler O'Neill analyst who

26   only a ten days earlier had issued a "Buy" recommendation on Pacific Capital stock.

27   ¶43.  The interview demonstrated the recklessness of Defendant Sandler O'Neill in

28   issuing a statement to the market that contained a "Buy" recommendation on PCB

4

stock despite the fact that, if prior to the rating upgrade, Sandler O'Neill and its employees had conducted the kinds of analyses that analysts typically -- and admittedly -- perform in assessing the financial condition of a bank, they would have understood that Pacific Capital was not, at that time, a good investment.  Deer acknowledged in an interview that his upgrade was the wrong call and that he should have followed the regulatory rule that Bank dividends are imperiled if the payouts are more than the banks have cumulatively earned over the last two years, but failed to do so.  Deer stated that "Honestly, I had not reviewed the earnings progression and considered how that would affect their ability to pay dividends."  ¶¶42, 43.

Deer clearly had access to all the information he needed to make a reasonable recommendation or to refrain from issuing a recommendation.  According to the June 27, 2009 *The Associated Press* article, Deer met with PCB's management a week before issuing his upgrade. ¶44.  Despite Deer's June 27, 2009 admission, Sandler O'Neill failed to correct the "buy" recommendation after acknowledging it to be "wrong" but knowingly carried forward an ongoing falsehood.

On July 30, 2009, the Company filed, a Form 8-K and press release for the quarter ended June 30, 2009, and announced that PCB experienced a second quarter 2009 net loss of $362.6 million, or ($7.77) per share, compared to a net loss of $5.9 million, or ($0.13) per common share, in the second quarter of 2008.  ¶47.  The Company disclosed it recorded a provision for loan losses of $194.1 million for the second quarter 2009, which, according to the disclosure, "increase[d] the Company's allowance for loan losses in the Core Bank by $117 million," and that "[a]t June 30, 2009, the allowance was $258.0 million, or 4.57% of total loans and 80% of non-performing loans."  The Company also disclosed a "$128.7 million non-cash charge to reflect an impairment of goodwill."  ¶47.

Despite the Company's previous reassurances on April 30, 2009, to the public and analysts that its residential, commercial and industrial loan portfolios were stable and the loan loss reserves for these portfolios was more than adequate, the Company

5

stated, in its July 30, 2009 Form 8-K and press release that the loss consisted of "$77.1 million to cover net charge-offs in the Core Bank, of which approximately $30.1 million related to the residential construction portfolio and $27.0 million related to the commercial and industrial portfolio; and $117.0 million added to the allowance for loan losses in the Core Bank to reflect an increase in problem loans and higher loss rates in recent quarters." ¶48.

The Company's July 30, 2009 Form 8-K and press release provided the following additional disclosures concerning the $194.1 million loan loss provision:

> Total non-performing assets were $348.3 million at June 30, 2009, compared to $271.1 million at March 31, 2009.  The increase in non-performing assets is primarily attributable to deterioration in the commercial real estate and construction portfolios.
>
> Approximately 27% of the Bank's total non-performing assets at June 30, 2009 were still current on interest and principal payments. These credits have been placed on non-performing status due to identification of some form of impairment, such as a decline in collateral value.  In such cases, the Bank has established a specific allowance against these impairments.  If these borrowers continue to demonstrate the ability to service their debt according to the agreed upon terms, the loans could be moved back to performing status in future quarters.

¶49.

The Company's allowance for loan losses increased from 2.48% of total loans and 54% of total non-performing loans at March 30, 2009 to 4.57% of total loans and 80% total non-performing loans at June 30, 2009.  ¶¶50,51.  While Defendants had previously indicated that the Company's loan loss reserves were "at a very high level" and that the Company "maintained a strong allowance for loan loss reserves" which would enable the Company to "absorb losses in the portfolio as the recession continues," the July 30 announcement revealed to investors that the Company had

6

1  not, at the time it assured investors it did, adequately reserved for loan losses and, in

2  fact, had not even applied a conservative methodology by which to do so. ¶¶27, 30,

3  54.

4        In reaction to the Company's July 30, 2009 disclosures, the price of the

5  Company's common stock fell, from closing at $2.6 on July 29, 2009, to $2.26 on

6  July 30, 2009, to $2.12 on July 31, 2009, representing a decline of approximately

7  19.5%.  At the start of the Class Period, on April 30, 2009, the price of the

8  Company's common stock closed at $6.94 per share, representing a Class Period

9  decline in value of 67.44%.  ¶57.  Finally, on July 31, 2009, Sandler O'Neill reversed

10  its June 17, 2009 upgrade of PCB common stock, and downgraded PCB common

11  stock from "Buy" to "Hold."  ¶58.

12  **IV.    ARGUMENT**

13        **A.    Reviewing and Pleading Standards**

14        When considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the

15  Court must accept as true all well-pled allegations in the complaint.  *Tellabs, Inc. v.*

16  *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322(2007).  Moreover, the court must

17  "draw all reasonable inferences in favor of the nonmoving party . . . and [a]ny

18  existing ambiguities must be resolved in favor of the pleading."  *In re Juniper*

19  *Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1045 (N.D. Cal. 2008) (quoting

20  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987)).

21        **B.    The Complaint Pleads Actionable False and Misleading Statements**

22        Plaintiff has sufficiently pled a false statement of material fact and has

23  provided the reason why it is false and misleading in order to satisfy Rule 9(b).  The

24  facts alleged in the Complaint demonstrate that Sandler O'Neill's "Buy"

25  recommendation was materially false and misleading and made without a reasonable

26  basis in light of the information that was available to Defendants.  The Complaint

27  alleges that by Mr. Deer's own admission, a "buy" recommendation would not have

28

7

1   been made if Mr. Deer had undertook the kind of analysis of PCB's financials which

2   he knew was supposed to perform.

3         **1.**      **Defendants' "Buy" Recommendation Was Made Without a**

4                 **Reasonable Basis**

5         Contrary to Defendant Sandler O'Neill's assertion, Deer's "Buy"

6   recommendation is actionable even though it expresses Defendant Sandler O'Neill's

7   recommendations or opinions regarding PCB.  "Classifying ratings as opinions does

8   not automatically shield them from liability under the securities laws."  *Brown v.*

9   *Credit Suisse First Boston Corp. (Agilent Technologies, Inc.) Analyst Reports Sec.*

10  *Litig.,* 431 F.3d 36, 47 (1st Cir. 2005).

11        Ninth Circuit law provides that statements of opinion are actionable under the

12  federal securities laws under certain circumstances.  *In re Apple Computer Sec. Litig.*,

13  886 F.2d 1109, 1113 (9th Cir. 1989).  In fact, unreasonably optimistic statements

14  which are contradicted by undisclosed material facts are actionable.   *Warsaw v.*

15  *Xoma Corp.*, 74 F.3d 955, 959-60 (9th Cir. 1996) (finding that the company's

16  optimistic statements, which failed to disclose concerns regarding the safety of a

17  product, actionable).  As set forth in *In re Apple,* "A projection or statement of belief

18  contains at least three implicit factual assertions: (1) that the statement is genuinely

19  believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is

20  not aware of any undisclosed facts tending to seriously undermine the accuracy of the

21  statement."  *Id*.  Consequently, "a projection or statement of belief may be actionable

22  to the extent that one of these implied factual assertions is inaccurate."  *Id.  See also*

23  *In re InterMune, Inc. Sec. Litig*., 2004 U.S. Dist. LEXIS 15382, at *11-12 (N.D. Cal.

24  July 30, 2004) (applying *In re Apple Computer*); *Nursing Home Pension Fund v.*

25  *Oracle Corp*., 242 F. Supp. 2d 671, 679-80 (N.D. Cal. 2002), rev'd on other grounds

26  by *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir.

27  2004*); In re 2TheMart.com Sec. Litig.*, 114 F. Supp. 2d 955, 961 (C.D. Cal. 2000)

28  (quoting *Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994) ("Statements of

8

expectation and belief are, however, actionable if '(1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy.'"). Plaintiff is not required to plead all three prongs of the test set forth by the Ninth Circuit in order for Sandler O'Neill's "Buy" recommendation to be an actionable statement. In fact, Plaintiff was not required to plead that the "Buy" recommendation was "subjectively false" or that Deer was aware of undisclosed facts that would have undermined the accuracy of this rating. In *In re 2TheMart.com*, this Court held actionable defendants' "statements or expectation and belief" based only on an analysis of the second factor set forth in *In re Apple*. 114 F. Supp. 2d at 961. The Court concluded that "Defendants had no reasonable basis to believe [its optimistic statements]" and applied only the second factor because it was "the one most applicable." *Id*.

It is clear from the allegations set forth in the Complaint that the Sandler O'Neill had no reasonable basis for its "Buy" recommendation of PCB stock. Mr. Deer upgraded his "Hold" recommendation to a "Buy" just days before PCB announced, inconsistent with a company having a "Buy" rating, it had deferred regularly scheduled interest payments on its outstanding $69.4 million of junior subordinated notes relating to its trust preferred securities, and that they would also suspend the payment of dividends on its common and preferred stock. ¶¶36, 40. Only five days after PCB's announcement, Mr. Deer admitted that he should not have issued a "Buy" recommendation because he failed to perform the kind of analysis that typically should have been performed by a stock analyst assessing the financial condition of PCB. ¶43. Deer also admitted that he should have been reviewing the earnings progression and the effect that it would have on PCB's ability to pay their dividends. *Id.* The Complaint alleges that Deer had access to all of the necessary information that he would have needed to make the proper analysis and that the analysis which he failed to conduct was commonplace. *Id.* These allegations clearly

9

1   evidence the fact that Deer had no reasonable basis supporting his recommendation of

2   a "Buy" for PCB stock.

3          Contrary to Sandler O'Neill's argument (Def. Mem. at 9), even considering the

4   entire research report that was part of the "Buy" recommendation, still does not

5   provide a reasonable basis for the recommendation in light of the information which

6   Mr. Deer failed to disclose or consider in his analysis.  While Sandler O'Neill argues

7   that the "Company Note provides the rationale" for the recommendation, the

8   information contained in the report would have undoubtedly changed if the proper

9   analysis on the Company's financials had been performed.  It then follows that the

10  "rationale" for the "Buy" recommendation would no longer be rational.  Sandler

11  O'Neill's reliance on *In re Credit Suisse First Boston (Agilent Tech., Inc.) Analyst*

12  *Reports Sec. Litig.*, 2005 U.S. Dist. LEXIS 6345 at *14-15 (D. Mass. Mar. 31, 2005)

13  is misplaced.  In *In re Credit Suisse*, the only reason the plaintiffs allege that the

14  "buy" recommendation was falsely rendered was so that the analysts would have

15  increased compensation and did not allege that the information contained in the

16  reports were false and misleading.

17         It is inconceivable that Sandler O'Neill find faults with Plaintiff's Complaint

18  because it did not include allegations as to "why" Deer's failure to apply the

19  regulatory rule that Bank dividends are imperiled if the payouts are more than the

20  banks have cumulatively earned over the last two years, would have precluded Deer

21  from making his "Buy" recommendation.  Def. Mem. at 10.  Deer himself admitted

22  that his upgrade from "Hold" to "Buy" was the wrong call and that if he would have

23  reviewed the earnings progression of PCB and followed the regulatory rule, he would

24  not have recommended a "buy" for PCB stock.  Plaintiff is not asking this Court to

25  assume that a Company that temporarily suspends a dividend "can never be a good

26  buy" (Def. Mem. at 10) but, is asking this Court to find actionable Sandler O'Neill's

27  "Buy" recommendation because there was clearly, and by Deer's own admission, no

28  reasonable basis supporting the recommendation.  Contrary to Sandler O'Neill's

1    arguments, Plaintiff's allegations are not an attempt to prove "fraud by hindsight" or

2    "second guesses."  These allegations do not assert that Defendants should have

3    clairvoyantly anticipated future events.  Rather, these allegations tend to establish

4    problems which existed at the time the alleged misrepresentations occurred." *See In*

5    *re Elec. Data Sys. Corp. Secs.*, 2004 U.S. Dist. LEXIS 289 at *27 n. 24 (E.D. Tex.

6    Jan. 13, 2004).

7         Numerous courts have denied motions to dismiss as to analyst defendants

8    where they issued materially false and misleading analyst reports, ratings and

9    recommendations.  *See Demarco v. Lehman Bros., Inc.*, 309 F. Supp. 2d 631

10   (S.D.N.Y. 2004) (the analyst reports' ratings themselves constituted material

11   misrepresentations.); *Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274

12   (S.D.N.Y. 2004) ("buy" recommendations in the research reports were misleading

13   statements that satisfied Rule 9(b); In *re Salomon Analyst Level 3 Litig.,* 350 F. Supp.

14   2d 477, 494 (S.D.N.Y. 2004) (plaintiff adequately pled with falsity with respect to

15   analyst's "buy" recommendation; *Swack  v. Credit Suisse First Boston*, 383 F. Supp.

16   2d 223 (D. Mass. 2004) (same).

## 2.    Plaintiff Has Adequately Pled the Failure to Downgrade the Stock Was An Actionable False Statement

19        Plaintiff's Complaint has sufficiently pled that Defendants' failure to

20   downgrade PCB stock was an actionable false statement.  The Complaint alleges that

21   on June 27, 2009, Deer admitted, in an interview conducted between the Company's

22   management and Deer, that his "Buy" recommendation had been a wrong call and

23   that he "had not reviewed the earnings progression and considered how that would

24   affect their ability to pay dividends."  ¶43.  However, it was not until July 31, 2009,

25   following the Company's announcement of its second quarter results, that Defendants

26   downgraded PCB's rating from a "Buy" to a "Hold". ¶58.  The Complaint

27   specifically alleges that this failure to downgrade for more than a month after Deer

28

11

1   admitted the "Buy" recommendation was "wrong was also materially false and

2   misleading because it knowingly carried forward an ongoing falsehood."  ¶68.

3         Once Deer admitted that his "Buy" recommendation was a wrong call, it

4   remained a wrong call until it was downgraded because there was no intervening

5   factor that occurred which made the recommendation accurate after the Company

6   made the June 22, 2009 announcement that it was suspending dividends.  This

7   announcement, which prompted Deer to admit that his recommendation was wrong,

8   should have also prompted him to downgrade PCB stock to at least a "Hold." If Deer

9   had done the proper analysis with respect to the Company's financials, he would not

10  have issued a "Buy" rating for PCB stock as he had already admitted.

11        Defendant Sandler O'Neill's argument that they did not have a duty to update

12  because Deer's "Buy" recommendation lacked the "definite positive projections that

13  might require later correction" does not hold water.  Def. Mem. at 13.  First, a duty to

14  update "concerns statements that although reasonable at the time made, become

15  misleading when viewed in the context of subsequent events." *In re Foxhollow*

16  *Technologies, Inc., Sec. Litig.*, 2008 U.S. Dist. LEXIS 52363, at *46  (N.D. Ca. May

17  27, 2008) *quoting In re Verity, Inc. Sec. Litig.,* 2000 U.S. Dist. LEXIS 11720 (N.D.

18  Cal. Aug. 11, 2000).  This is not the case here.  This case involves a duty to correct

19  which applies to statements "that are false at the time they are made, and it arises

20  'when [the defendant] learned that its prior statement … was untrue.'" *In re*

21  *NovaGold Res. Inc. Secs. Litig.,* 629 F. Supp. 2d 272, 301 (S.D.N.Y. 2009) *quoting*

22  *Lattanzio v. Deloitte & Touche LLP,* 476 F.3d 147, 154 (2d Cir. 2007); *see also In re*

23  *Verity,* at *13-14.  Second, the duty to correct is not as limiting as the duty to update.

24  *Overton v. Todman & Co.*, 478 F.3d 479, 486-487 (2d Cir. 2007) (Auditor may be

25  held primarily liable when the auditor makes a statement in its opinion that is false or

26  misleading, knows or should know that potential investors are relying on the opinion,

27  yet fails to take reasonable steps to correct or withdraw its opinion).  Defendants had

28  a duty to correct its prior "Buy" recommendation as soon as they discovered that it

was misleading and this failure to do so was materially false and misleading because Defendant knowingly carried forward an acknowledged falsehood which they knew investors would continue to rely on.

Plaintiff does not dispute that Deer fully disclosed on June 27, 2009, that he issued the "Buy" recommendation without doing the proper financial analysis, but, Plaintiff is simply alleging that once Deer knew that the "buy" recommendation was false, he had a duty to correct it.  Defendants' reliance on *In re Textainer P'ship Sec. Litig.*, 2005 U.S. Dist. LEXIS 40974, at *20-21 (N.D. Cal. Dec. 12, 2005) is misplaced because Plaintiff is not alleging that Defendants' failure to downgrade meant that Defendants were hiding something (Def. Mem. at 13).  Plaintiff is alleging that Defendant Sandler O'Neill's failure to downgrade PCB stock, after the Company's June 22nd disclosure and by Deer's own admission that the recommendation was wrong, is in itself false and misleading because the false recommendation was still out in the public.

Plaintiff's claim is based primarily on Sandler O'Neill's materially false and misleading "buy" recommendation.  In fact, Plaintiff's purchase of PCB common stock took place on June, 17, 2009, following, and based in part upon, Sandler O'Neill's June 17, 2009 upgrade of PCB's common stock from "Hold" to "Buy."  ¶8. It does not matter that Plaintiff sold his stock on June 22, 2009, because Defendant Analyst's failure to correct the "buy" recommendation to a "hold," since Plaintiff alleges that the present action is part of a common scheme to defraud is alleged and that over a particular time period (the Class Period) Sandler O'Neill made false and misleading statements. *Blackie v. Barrack*, 524 F. 2d 891 at 903 n. 19 (9th Cir. 1975), *citations omitted* ("Rule 10b-5 liability is not restricted solely to isolated misrepresentations or omission; it may also be predicated on a 'practice, or course of business which operates … as a fraud …'").

13

1  **C.    The Complaint Adequately Alleges that Defendants' Acted With**
2  **Scienter**

3      In *Tellabs*, the Supreme Court confirmed the Ninth Circuit's long-standing rule
4  that courts "must consider the complaint in its entirety" and determine whether "all of
5  the facts alleged, taken collectively, give rise to a strong inference of scienter, not
6  whether any individual allegation, scrutinized in isolation, meets that standard."
7  *Tellabs*, 551 U.S. at 323, *citing Gompper v. Visx*, 298 F.3d 893, 897 (9th Cir. 2002).
8  A strong inference of scienter is raised when a reasonable person would deem the
9  inference of scienter cogent and "**at least likely as** any plausible opposing inference."
10  *Id*. at 329 (emphasis in original).

11      Moreover, *Tellabs* cautioned that the "inference that defendant acted with
12  scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even 'the most
13  plausible of competing inferences.'" *Id.* at 322.  Indeed, "a plaintiff is not forced to
14  plead more than she would be required to prove at trial."  *Id*. at 329.  "[F]ederal courts
15  certainly need not close their eyes to circumstances that are probative of scienter
16  [when] viewed with a practical and common-sense perspective." *South Ferry LP,*
17  *No.2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  Indeed, the Ninth Circuit
18  acknowledge that, under *Tellabs*, "[v]ague or ambiguous allegations are not properly
19  considered as part of a holistic review when considering whether the complaint raises
20  a strong inference of scienter." *Id.*

21      In this action, Plaintiff alleges that Sandler O'Neill issued its June 17, 2009
22  upgraded rating of "Buy" for PCB stock even though the Sandler O'Neill analyst
23  admittedly did use and/or follow certain simple calculations and regulatory rules that
24  could have been foreseen the Company's difficulties.  *See*, *e.g.*, ¶¶36, 42-44, 71.
25  Moreover, Sandler O'Neill failed to correct the June 17, 2009 rating upgrade even
26  after its analyst admitted during an interview for *The Associated Press*, as published
27  in a news article dated June 27, 2009, that the upgrade was "wrong."  ¶¶42-44, 72.
28  Instead, Sandler O'Neill waited for four more weeks to pass prior to reversing the

14

1  upgrade.  ¶72.  In addition, as alleged in the Complaint, Sandler O'Neill "benefitted

2  from their false or reckless statements about PCB common stock, as they were

3  retained by the Company by the end of the Class Period to serve as financial advisor

4  in connection with a process initiated by the Company's board of directors to identify

5  and evaluate a broad range of strategic alternatives."  ¶73.

6          While each of these allegations alone satisfy the Plaintiff's scienter pleading

7  requirement, when "taken collectively" they certainly raise a very strong interference

8  that Sandler O'Neill made its false and misleading public statements and/or omissions

9  regarding PCB either intentionally or with deliberate recklessness.  *See, e.g.*, *Ronconi*

10  *v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001), cited by Defendant.  Accordingly,

11  Plaintiff has adequately pled scienter.

12          **D.      Plaintiff Adequately Pleads Loss Causation**

13          With respect to loss causation and Sandler O'Neill, Plaintiff alleges that on

14  June 17, 2009, Sandler O'Neill issued an upgrade on PCB stock to a "Buy" from a

15  "Hold" (¶36) and then, just five days later, the Company announced that it was

16  deferring regularly scheduled interest payments on its debt and that it was cutting its

17  dividend on its common stock and preferred stock (¶40), resulting in the price of PCB

18  stock falling from a closing price of $3.31 per share on June 22, 2009 to $2.26 per

19  share on June 26, 2005.  (¶41).  These allegations easily satisfy the elements of loss

20  causation under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).  All a

21  plaintiff need do under *Dura* is "'provide a defendant with some indication of the loss

22  and the causal connection that the plaintiff has in mind.'"  *Plumbers & Pipefitters*

23  *Local 57 Pension Fund. Cisco Systems, Inc.*, 411 F. Supp. 2d 1172, 1175 (N.D. Cal.

24  2005), quoting *Dura*, 544 U.S. at 347 (emphasis in original).  The loss causation

25  requirement is "not meant to impose a great burden upon a plaintiff' and simply

26  requires a plaintiff to provide a short and plain statement in accordance with Fed. R.

27  Civ. P. 8(a)(2) setting forth the relevant loss and "what the causal connection might

28  be between" plaintiff's loss and defendants' misconduct.  *Dura*, 544 U.S. at 347.

1   While *Dura* did not specify how the causal link could be satisfied, courts in

2   this Circuit have held that allegations that a stock declined following a disclosure of

3   at least part of the truth is sufficient to allege the necessary causal connection. *See,*

4   *e.g. In re Daou Sys. Inc. Sec. Litig.*, 411 F.3d 1006, 1026-27 (9th Cir.

5   2005)(allegations that a series of partial disclosures revealed company's "true

6   financial health" satisfy *Dura*); *Cisco Systems*, 411 F. Supp. 2d at 1177-78 (stock

7   decline following partial disclosures sufficient to plead loss causation under *Dura*).

8   The revelations to the market need not take the form of a single, unitary

9   disclosure (e.g. disclosure of cut in dividend), but rather may consist of a series of

10  partial disclosures from a number of sources that cause the truth to make its way into

11  the market.  That is precisely the theory of loss causation sustained by the Ninth

12  Circuit in *Daou* and by the Northern District of California in *Cisco Systems*.

13  Numerous recent decisions applying *Dura* are in agreement.  *See, e.g. In re Bradley*

14  *Pharms. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006) ("We disagree with

15  Defendants' rigid and dogmatic interpretation of *Dura*. . . [T]he revelation of the

16  'truth'. .   did not take the form of a single, unitary, disclosure but occurred through a

17  series of disclosing events'"); *In re Seitel Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 710

18  (S.D. Tex. 2006), citing *Dura*, 544 U. S. at 342, ('[t]he Complaint further alleges a

19  series of partial disclosures that caused the trust to begin to 'leak out' and 'make its

20  way into the marketplace' causing the stock price to fall significantly'"); *Steiner v.*

21  *MedQuist, Inc.*, 2006 WL 2827740 at * 20 (D.N.J. Sept. 29, 2006) (""[T]he

22  [complaint] is replete with allegations that the stock was negatively affected by a

23  number of partial disclosures revealing the fraudulent billings scheme.").  As one

24  court aptly noted: "[R]eading *Dura* to require proof of a complete, corrective

25  disclosure would allow wrongdoers to immunize themselves with protracted series of

26  partial disclosures." *Freeland v. Iridium World Communications*, 233 F.R.D. 40, 47

27  (D.D.C. 2006).

28

1    The Complaint "contains the very allegations regarding share price decrease

2  and public exposure to the truth the Supreme Court found lacking in the *Dura*

3  complaint." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1025 (S.D. Cal.

4  2005). The Complaint describes the statements by the PCB Defendants that inflated

5  the market price of PCB stock, describes the "Buy" recommendation by Sandler

6  O'Neill and connect those disclosures to the declines in the price of PCB stock. That

7  is all that is required under *Dura*.

8    Defendants acknowledge these price declines, but raise a host of factual

9  arguments disputing the relationship between the corrective disclosures and the price

10  drops during the Class Period. For example, Sandler O'Neill asserts that Plaintiff

11  does not allege that the stock price went up in response to the "Buy"

12  recommendation; that Plaintiff's loss was caused when the market became aware that

13  a prior statement made by Sandler O'Neill was false or when the analyst admitted that

14  his recommendation was wrong; that the plaintiff could not have been injured from

15  the market learning the recommendation was wrong because he sold his stock before

16  Sandler O'Neill admitted the recommendation was wrong. Def. Mem. at 18-20.

17  These are quintessential fact issues to be decided by the jury. *See e.g. In re Immune*

18  *Response*, 375 F. Supp. 2d at 1025 ("Whether the alleged omissions and

19  misstatements actually were the cause-in fact of the [decline in ] price of

20  [defendant's] stock raises an issue of fact and, a s such, is a question reserved for a

21  motion for summary judgment or for the trier of fact."); *In re Seitel. Inc.*, 447 F.

22  Supp. 2d at 713 ("Defendants' fact-based argument [regarding the reasons for the

23  price decline] disputes the allegations in the Complaint and, therefore, requires a fact-

24  specific inquiry at the summary judgment or trial stage."

25    Moreover, there is a jury question as to when the market began to learn that the

26  "Buy" recommendation was wrong. Clearly, a jury could find that the market began

27  to suspect that the "Buy" recommendation was wrong when PCB announced on June

28  22, 2009, that it had deferred regularly scheduled interest payments on its outstanding

17

$69.4 million of junior subordinated notes and that it was suspending the payment of dividends on its common and preferred stock.  ¶40.  There is no need for the market to learn from the mouth of Sandler O'Neill that the recommendation was wrong for it to start to put two and two together.[3]

Just because there may have been other factors that may have provided market forces does not provide the basis for granting a motion to dismiss.  In fact, the Ninth Circuit in *Daou* and the Northern District in *Cisco Systems* have made clear that a plaintiff is not required to show that the alleged misrepresentation was the "sole reason' for the stock's decline in value, other contributing forces will not bar recovery under the loss causation requirement." *Cisco Systems*, 411 F. Supp. 2d at 1176 (quoting *Daou*, 411 F. 3d at 1025.) It is for the jury to decide the amount of the stock decline between April and July 2009 that was due to either the fraud of Sandler O'Neill or the PCB Defendants.  Moreover, Sandler O'Neill cites no authority to support its suggestion that the complaint is somehow deficient because there is no allegation that the price of PCB stock rose following the "buy" recommendation. Sandler O'Neill Br. at 19).  While *Dura* held that allegations of inflation alone do not satisfy the loss causation requirements, it cites no requirement to allege that the price of the stock increase upon the announcement of the allegedly false statement.

## E.    If Necessary, Leave to Amend is Appropriate

If this Court is inclined to dismiss any part of Plaintiff's Complaint, Plaintiff respectfully requests leave to amend.  First, because co-lead plaintiffs and co-lead counsel had not yet been appointed at the time the Motion(s) to Dismiss were filed (and in the case of the Jurkowitz action, fully briefed and pending before this Court), it is reasonable to grant leave to amend so the co-lead plaintiff may file an amended

---

[3]  While the Rachel Beck interview may have formalized the fact that a "Buy" recommendation was inappropriate there was little factually revealed on that interview about PCB's financial condition.  What this interview did provide was an explanation of the recklessness of the analyst that led to the "Buy" recommendation.

18

1    complaint on behalf of the Class.  Second, notwithstanding the procedural posture of

2    this action, pursuant to the Federal Rules, the "court should freely give leave when

3    justice so requires."  Fed R. Civ. P. 15(a)(2).

4        Second, Rule 15 of the Federal Rules of Civil Procedure states that such leave

5    should be "freely give[n] when justice so requires."  Fed. R. Civ. P. 15(a)(2); *See*

6    *Foman v. Davis*, 371 U.S. 178, 182 (1962).  While Rule 15(a) confers discretion on

7    the district court, that discretion is limited "to facilitate decision on the merits, rather

8    than on the pleadings."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000); accord

9    *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981).  "Dismissal with prejudice

10   and without leave to amend is not appropriate unless it is clear on de novo review that

11   the complaint could not be saved by amendment."  *Eminence Capital, L.L.C. v.*

12   *Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003), citations omitted, ("In this

13   technical and demanding corner of the law, the drafting of a cognizable complaint can

14   be a matter of trial and error").  Moreover, as in *Broudo v. Dura Pharmaceuticals,*

15   *Inc.*, 339 F.3d 933 (9th Cir. 2003), and *Eminence Capital, LLC*, 316 F.3d 1048 (9th

16   Cir. 2003), there is additional information which can be pled in this consolidated

17   action and which Plaintiff believes will further support the Class's claims.

18   Accordingly, Plaintiff respectfully requests that, if this Court is inclined to grant any

19   part of Defendant's Motion to Dismiss, Plaintiff be granted leave to amend.

20

21

22

23

24

25

26   ///

27   ///

28   ///

19

## V.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendant Sandler O'Neill's Motion to Dismiss in its entirety.


                                        **STULL, STULL & BRODY**


Dated: January 15, 2009          By:        s/Patrice L. Bishop
                                       Patrice L. Bishop
                                       10940 Wilshire Boulevard
                                       Suite 2300
                                       Los Angeles, CA  90024
                                       Tel:   (310) 209-2468
                                       Fax:   (310) 209-2087

                                       Mark Levine
                                       STULL, STULL & BRODY
                                       6 East 45th Street
                                       New York,  NY 10017
                                       Tel:   (212) 687-7230
                                       Fax:   (212) 490-2022

                                       Lionel Z. Glancy
                                       Michael Goldberg
                                       **GLANCY BINKOW & GOLDBERG LLP**
                                       1801 Avenue of the Stars
                                       Suite 311
                                       Los Angeles, CA  90067
                                       Tel:   (310) 201-9150
                                       Fax:   (310) 201-9160

                                       **Co-Lead Counsel for Lead Plaintiffs and the
                                       Purported Class**

Z:\STULL\PACIFIC CAPITAL\PLD\Opp MTD Shotke by SON.wpd